STATE of Wisconsin, Plaintiff-Respondent,

v.

Donavan W. MALONE, Defendant-Appellant.

Supreme Court

*No. 02–2216–CR. Oral argument November 6, 2003.—Decided July 8, 2004.*

2004 WI 108

(Also reported in 683 N.W.2d 1.)

For the defendant-appellant there was a brief by *John A. Cabranes* and *Servantez & Cabranes,* Racine, and oral argument by *John A. Cabranes.*

For the plaintiff-respondent the cause was argued by *Gregory M. Weber,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

¶ 1. DAVID T. PROSSER, J. This case is before the court on certification by the court of appeals. The court of appeals asks us to address whether, during a routine traffic stop, a law enforcement officer may request the passengers, as well as the driver, to exit the vehicle and individually ask them questions reasonably related to the nature of the stop.

¶ 2. This certified issue arises in the case of Donavan W. Malone, who was a passenger in a vehicle stopped for speeding. After a series of events, including the questioning of all three occupants of the vehicle, Malone was arrested and the vehicle was searched incident to his arrest. He appeals the April 29, 2002,

decision of the Manitowoc County Circuit Court, Darryl W. Deets, Judge, denying his motion to suppress physical evidence of drug trafficking. Malone ultimately pleaded no contest to conspiracy to deliver tetrahydrocannabinols (THC).

¶ 3. Malone sought to suppress the physical evidence on grounds that it was obtained in contravention of his Fourth Amendment protection against unreasonable searches and seizures. Malone does not dispute the validity of the traffic stop, nor does he directly challenge a pat-down search of his person and subsequent vehicle search that produced physical evidence of drug courier activity. Malone instead focuses on the questions an officer directed to him outside of the stopped vehicle, which he argues bore no reasonable relationship to the purpose of the traffic stop. Without this reasonable relationship, Malone argues, the officer unreasonably extended his detention of the occupants without a basis to initiate a narcotics investigation, which might justify the intrusion occasioned by the questioning.

¶ 4. We hold that the law enforcement officer in this case acted reasonably. Assuming that the officer asked Malone questions outside the scope of the initial traffic stop, the officer nonetheless had become aware of specific and articulable facts giving rise to the reasonable suspicion that a crime had been, was being, or was about to be committed. Therefore, the officer was justified in briefly detaining and questioning Malone regarding that suspicion. Accordingly, we affirm the circuit court's decision to deny Malone's motion to suppress the physical evidence obtained against Malone.

## I. FACTS AND PROCEDURAL POSTURE

¶ 5. The underlying facts are not in dispute. On Wednesday, November 7, 2001, Wisconsin State Patrol Trooper Andrew Hyer was patrolling Interstate Highway 43 in Manitowoc County when he clocked a southbound vehicle moving 77 miles per hour in contravention of the posted 65 miles per hour speed limit. Hyer stopped the vehicle and spoke to the driver, who produced a driver license that identified him as Joshua Moede. In response to initial inquiries by Hyer, Moede indicated that he believed he had been traveling 78 miles per hour, and admitted that he was not wearing his seat belt. Hyer procured driver licenses from the other two occupants in the vehicle because he observed that they were not wearing seat belts either. Hyer returned to his squad car to run record checks on the three occupants. Cory Marohl sat in the front passenger seat; Donavan Malone sat in the back seat on the passenger side. During his initial contact, Hyer determined that the car belonged to Marohl, but Moede was driving because Marohl did not have a valid license.

¶ 6. Upon approaching the vehicle, Hyer had observed an unusual number of air fresheners hanging from the vehicle's rearview mirror. He estimated that there were seven or eight air fresheners. In cross-examination, Hyer stated that based on his drug indicator training, he was aware that air fresheners are used to mask drug odors. Hyer also stated that I-43 was a primary area for drug interdiction activities.

¶ 7. Hyer asked the driver, Moede, to step out of the vehicle and move behind it. When asked where the occupants were heading, Moede responded that they were going to a family member's house in Milwaukee. Hyer stated that Moede was continually putting his

hands in his pockets during their conversation and Moede consented to a pat-down for Hyer's safety. The officer found nothing. This interaction lasted approximately 30 to 45 seconds after which Hyer asked Moede to get back into the car.

¶ 8. Hyer then requested that Marohl exit the car and stand between his car and the squad car, and Hyer asked him where they were going. Marohl responded that they were going to a rave party in Milwaukee and, without further questioning, he volunteered that he was on probation for drug-related offenses. When Hyer asked him whether his probation officer would approve of his attending a party in Milwaukee, Marohl indicated that only Moede and Malone were actually going to the party. Hyer stated that Marohl was also "fidgety" and putting his hands in his pockets. Because of this, Hyer asked for consent to pat Marohl down and Marohl consented. The pat-down produced no weapons. After this interaction of about 30 to 45 seconds, Hyer asked Marohl to get back into the car and provide his vehicle registration.

¶ 9. At this time Hyer asked Malone, 20, to step out and stand between the two cars. Hyer asked about their destination, and Malone stated that they were going to visit some family members, but he was only along for the ride and didn't know the family. Hyer asked Malone whether he had gotten any tickets in his life. Malone stated that he had received some traffic tickets and some drug-related tickets. When asked whether he was still using drugs, Malone stated that he was still using marijuana. Hyer asked if Malone had any marijuana on him and Malone said no.

¶ 10. Malone, like Moede and Marohl, was putting his hands in his pockets contrary to Hyer's instructions. Hyer asked if Malone would consent to a pat-down, and

Malone agreed. Hyer found two objects that felt like boxes in Malone's front right pants pocket and a third object about the size of a half dollar that felt "squishy" to the touch. Hyer asked what the objects were, and Malone stated that he just had cigarettes. However, Hyer testified that based on his training and experience, the object felt like a packet rolled up to hold marijuana. Because Malone would not identify the packet, and because of his suspicion, Hyer removed the packet. The object was a "baggie that was rolled up in a manner common among drug users" containing a few specks of a green leafy material and smelling strongly of marijuana. Malone stated that he did not know what the baggie was or why it was in his pocket. Hyer placed Malone under arrest for possession of marijuana, handcuffed him, and detained him in the back of his squad car.

¶ 11. Hyer contacted his dispatcher and requested backup. After backup arrived in the person of Manitowoc County Deputy Sheriff Raube, Hyer performed two field tests on the suspected marijuana with inconclusive (not positive) results. Hyer contacted his supervisor who stated that arrest was probably not justified, but a search was. Hyer asked Moede and Marohl to exit the vehicle and a full search of the two was performed, yielding nothing. Moede and Marohl were then placed in Raube's squad car. Hyer and Raube began a search of the car, but stopped when Raube informed Hyer that a K-9 unit was on its way. When the K-9 unit arrived, the dog indicated the center armrest and driver side back seat. Hyer and Raube continued their search concentrating on the areas indicated by the dog. The search yielded a marijuana pipe containing a black residue and smelling of marijuana, Zig-Zag rolling papers, and $4,400 in cash bundled in a rubber band.

Also discovered was a duffle bag containing a dry brown leafy substance along with a second duffle bag. This second bag smelled of marijuana and contained some green leafy material in the bottom of the bag. At this point, Moede and Marohl were also placed under arrest. While he was in custody, Malone gave a statement in which he admitted that he was en route to Milwaukee to purchase marijuana for resale.

¶ 12. On November 26, 2001, Malone was charged with being party to the crime of conspiring to deliver THC based on the evidence found in the car. On January 23, 2002, Malone filed a motion to suppress all physical evidence taken from him or from the car on grounds that the search was in violation of the Fourth Amendment of the United States Constitution and Article I, § 11 of the Wisconsin Constitution. On April 29, the circuit court denied the suppression motion in a written decision. The court determined that Hyer had probable cause to seize the packet from Malone's pocket based on the unusual number of air fresheners, Marohl's statement that they were attending a rave party, the nervousness of all three individuals, the fact that Malone had been ticketed for drug-related offenses, and Malone's admission that he was still using marijuana. Once Hyer seized the packet, there were proper grounds to continue the search. Malone later entered a guilty plea to one count of conspiracy to deliver THC.

¶ 13. Malone appealed the circuit court's denial of his suppression motion. This court granted certification on the issue of whether, during a routine traffic stop, the police may request the passengers, as well as the driver, to exit the vehicle and individually ask them questions reasonably related to the nature of the stop.

## II. STANDARD OF REVIEW

¶ 14. The issue in this case is whether Hyer's actions violated Donavan Malone's constitutional guarantees against unreasonable searches and seizures. The inquiry is thus one of constitutional fact. *State v. Griffith,* 2000 WI 72, ¶ 23, 236 Wis. 2d 48, 613 N.W.2d 72 (citing *State v. Kieffer,* 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998)). We analyze issues of constitutional fact within a bifurcated framework, on one hand giving deference to the circuit court's findings of evidentiary fact, and on the other reviewing independently the circuit court's application of those facts to constitutional standards. *State v. Pallone,* 2000 WI 77, ¶ 27, 236 Wis. 2d 162, 613 N.W.2d 568 (citing *State v. Martwick,* 2000 WI 5, ¶¶ 16–18, 231 Wis. 2d 801, 604 N.W.2d 552; *State v. Richardson,* 156 Wis. 2d 128, 137–38, 456 N.W.2d 830 (1990)). Malone does not argue that the circuit court came to erroneous factual conclusions; thus our review of the circuit court's application of the facts to constitutional standards is de novo.

## III. ANALYSIS

¶ 15. The Fourth Amendment of the United States Constitution protects "[t]he right of the People to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.[1] The interpretation of our state

---

[1] The Fourth Amendment reads in its entirety:

The right of the People to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon

constitution's analogous provision[2] has evolved in virtual lockstep with the United States Supreme Court's jurisprudence construing the Fourth Amendment. *Griffith*, 236 Wis. 2d 48, ¶ 24 n.10 (citing *State v. Kiper*, 193 Wis. 2d 69, 80, 532 N.W.2d 698 (1995)).

¶ 16. Malone asserts that Trooper Hyer intruded upon his right to be free from unreasonable searches and seizures. He argues that Hyer extended the stop to question Malone beyond what was necessary to investigate the traffic violation and with an insufficient factual basis to initiate a separate narcotics investigation. If the pat-down search of Malone's person occurred during a seizure that violated Malone's Fourth Amendment protections, then the fruits of that search should have been suppressed. *See Terry v. Ohio*, 392 U.S. 1, 12 (1968) ("Ever since its inception, the rule excluding evidence seized in violation of the Fourth Amendment has been recognized as a principal mode of discouraging lawless police conduct.").

A. Bright-Line Rule

■

¶ 17. In this case, the court of appeals asks whether, during a routine traffic stop, a law enforcement officer may request the passengers, as well as the

---

probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[2] Wis. Const., art. 1, § 11:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

driver, to exit the vehicle and individually ask them questions reasonably related to the nature of the stop. This certified question is difficult to answer because it calls upon this court to formulate a bright-line rule that law enforcement action in this regard is either always permitted or always prohibited. The Supreme Court has "eschewed bright-line rules [in Fourth Amendment inquiries], instead emphasizing the fact-specific nature of the reasonableness inquiry." *Ohio v. Robinette,* 519 U.S. 33, 39 (1996); *see also Florida v. Bostick,* 501 U.S. 429, 439 (1991) (rejecting a per se rule in favor of an inquiry into "all the circumstances surrounding the encounter."); *Michigan v. Chesternut,* 486 U.S. 567, 572–73 (1988) (rejecting the parties' proposals for bright-line rules in favor of a fact specific analysis); *Sibron v. New York,* 392 U.S. 40, 59 (1968) ("The constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case."); *Go-Bart Importing Co. v. United States,* 282 U.S. 344, 357 (1931) ("There is no formula for the determination of reasonableness. Each case is to be decided on its own facts and circumstances.").

¶ 18. It would be unwise for us to attempt to fashion a single rule purporting to encompass the innumerable variations of a routine traffic stop. In this case, for instance, there were three people in the car—one driver and two passengers. None of these persons was wearing a seat belt. The driver was not the owner of the car; the front seat passenger was. The three occupants were young men between 20 and 22 years of age, from Shawano County, driving on a Wednesday evening to Milwaukee, roughly three hours away. The driver failed to give a clear plausible explanation of the group's destination. In addition, the

officer had access to some of the records of the occupants before any of the occupants were asked to get out of the car. The facts here are different from many others that might be conceived.

## B. Standing

¶ 19. This case presents a series of small incremental events leading to the search of Marohl's car and the seizure of marijuana and other drug-related evidence. Part of Malone's strategy is to attack links in this chain that do not involve Malone, and this raises the question whether he has "standing" to do so.

¶ 20. The court of appeals, in its certification, makes observations and queries that underscore Malone's approach:

> [I]n this case the passengers, Malone and *Marohl*, were not wearing seat belts when the car was stopped by Hyer; if the trooper can question *them*, are the reasonable questions he may ask limited to *their* seat belt violation or may *they* be asked questions related to the original reason for the traffic stop? If the *passengers* had not been guilty of any traffic regulation violation, may *they* be questioned to verify the information provided by the *driver?* If the *passengers* may be questioned, can the trooper require *them* to exit the vehicle and question *them* separately to test for *consistency* of information? If the trooper perceives the information he receives to be inconsistent, does that constitute an articulable suspicion justifying an expansion of the scope of the stop?

*State v. Malone,* No. 02–2216–CR, 2003 WL 21659174 at *3 (Wis. Ct. App. July 16, 2003) (emphasis added). If we answered all these questions, we would necessarily address issues relating not just to Donavan Malone's Fourth Amendment protections, but also the protec-

tions of defendants not party to this appeal. We would also come close to fashioning the bright-line rule that we seek to avoid.

¶ 21. Law enforcement action is to be judged against the standard of reasonableness, which in turn "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' " *Pennsylvania v. Mimms,* 434 U.S. 106, 109 (1977) (quoting *United States v. Brignoni-Ponce,* 422 U.S. 873, 878 (1975)). In crafting this balance, this court must carefully scrutinize the totality of the circumstances. *Robinette,* 519 U.S. at 39.

¶ 22. There are broad principles of search and seizure, but each case must be evaluated on its own facts. The facts may be different for members of the same group. Consequently, each person's encounter with law enforcement should be evaluated individually. Our constitutional guarantee against unreasonable searches and seizures is a personal right that may not be asserted vicariously. *Rakas v. Illinois,* 439 U.S. 128, 133–34 (1978). A party attempting to exclude evidence obtained as a result of a search or seizure that violates the Fourth Amendment must demonstrate a legitimate expectation of his own privacy in the object of the search or must himself be the person seized. To understand why "standing" matters under these facts, it is important that we set forth Malone's position as we understand it.

¶ 23. In his brief to this court, Malone focuses on whether Hyer had reasonable suspicion to initiate a narcotics investigation. He contends that the case "presents two separate and distinct investigations." Trooper

Hyer's subjective motivation may have been to pursue suspected narcotics trafficking, but his subjective motivations play no part in our analysis, *Whren v. United States*, 517 U.S. 806, 813 (1996), and the term "narcotics investigation" is an unsatisfactory description of Hyer's actual conduct because it does not capture the gravamen of Malone's legal argument. At oral argument, Malone clarified that he objected to the *questions* posed to Malone outside the vehicle, as well as the technique of the officer asking each occupant of the vehicle questions and comparing the answers Hyer received.

¶ 24. We note that the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of the [Fourth Amendment]." *State v. Harris*, 206 Wis. 2d 243, 253, 557 N.W.2d 245 (1996) (alteration in original) (quoting *Whren*, 517 U.S. at 809–10). The seizure here was a traffic stop, and we evaluate the reasonableness of Hyer's conduct under principles similar to those used to address a so-called *Terry* stop. *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)). Under this approach, we must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. However, if during a valid traffic stop, an officer becomes aware of suspicious factors or additional information that would give rise to an objective, articulable suspicion that criminal activity is afoot, that officer need not terminate the encounter simply because further investigation is beyond the scope of the initial stop. *State v. Betow*, 226 Wis. 2d 90, 94–95, 593

N.W.2d 499 (Ct. App. 1999). We might conceptualize this as a new, distinct investigation, but in reality there may not be a distinct line separating the two investigations—the first investigation may overlap the second without any outward indication of a shift.

¶ 25. Malone does not challenge Hyer's decision to stop the car in which Malone was riding. Because Hyer lawfully stopped the vehicle, Malone was also lawfully stopped. This distinguishes the case from *Harris*. Malone's position is that, at some point in time, Hyer's actions, specifically his questions, were no longer reasonably related in scope to the circumstances that justified the interference in the first place.

■

¶ 26. We promulgated a framework to assess such claims in *Griffith*. The reasonableness of a seizure that is alleged to impermissibly detain an individual for questioning can be measured by examining two variables. First, the *nature* of an officer's actions may exceed the scope justified by the original stop, raising the question whether "the incremental intrusion" of additional questions is unreasonable when balanced against the public interest. *Id.*, ¶ 37–38. Second, the *duration* of law enforcement questioning during a valid traffic stop "can transform a reasonable seizure into an unreasonable one if it extends the stop beyond the time necessary to fulfill the purpose of the stop." *Id.*, ¶ 54 (citing *United States v. Sharpe*, 470 U.S. 675, 684–85 (1985) ("[I]f an investigative stop continues indefinitely, at some point it can no longer be justified as an investigative stop.")).

■

¶ 27. Thus Malone can challenge the nature of the questions posed to *him*, as well as the duration of the stop, as these factors involve Malone directly. Mal-

one does not have standing under the Fourth Amendment, however, to challenge the nature of questions Hyer posed to Moede, the driver, or Marohl, the other passenger. "It is one thing to allow a passenger to object to the fruits of an unduly prolonged stop, which would also affect his freedom directly; it is quite another to allow a passenger to object to, e.g., the asking of an improper question of the driver." 5 Wayne R. LaFave, *Search and Seizure* § 11.3, n.230.1 (Supp. 2004) (internal cross-references omitted) (citing *United States v. Rodriguez-Arreola*, 270 F.3d 611 (8th Cir. 2001) (holding that one does not have a legitimate expectation of privacy in other vehicle occupants' knowledge)). Malone cannot circumvent the principle that Fourth Amendment protections are personal by challenging Hyer's conduct in asking each passenger to exit the vehicle and posing to them a short series of questions. To adopt such a principle would abandon the holding in *Rakas*. *See* ¶ 22, *supra*.

¶ 28. In addition, both the court of appeals and Malone raise the issue of Hyer's tactics in comparing each occupant's story for consistency. We must be careful to distinguish an officer's use of information once obtained from the tactics used to obtain it. Unless Malone has standing to challenge the manner in which that information was obtained, the use of that information by the officer to compare stories is not a violation of Malone's Fourth Amendment rights. Because Malone has no standing to challenge the questions asked of Moede and Marohl, there is no basis for him to challenge Hyer's actions unless Hyer violated Malone's own Fourth Amendment rights.

## C. Nature of Hyer's Questions to Malone

¶ 29. In *Griffith,* we examined the extent to which a law enforcement officer may question an individual during an investigative detention, and concluded that we must determine whether the "incremental intrusion" resulting from the nature of the questioning is unreasonable. 236 Wis. 2d 48, ¶ 38. We evaluate the incremental intrusion by weighing "the public interest served by the questioning against the incremental liberty intrusion that resulted from the questioning." *Id.* (citing *Maryland v. Wilson,* 519 U.S. 408, 411–12 (1997); *Brown v. Texas,* 443 U.S. 47, 50 (1979); *Mimms,* 434 U.S. at 109; *Terry,* 392 U.S. at 20–21).

¶ 30. In this vein, Malone asserts that Hyer lacked reasonable suspicion to initiate any investigation into narcotics: "[T]he only basis for [Hyer's] extending the traffic stop is that he saw an unusual number of air fresheners." By Malone's lights, "an unusual number of air fresheners in the vehicle (without the corresponding masking odor) does not, in [and] of itself, provide evidence of drug courier activity or drug use." Accordingly, Malone asserts that the physical evidence obtained in the ensuing searches was a result of an illegal detention and must therefore be suppressed.

¶ 31. However, this argument misstates the relevant inquiry because it assumes that the reasonableness of Hyer's actions vis-à–vis Malone should be measured by the information Hyer possessed at the outset of the encounter. Malone does not challenge Hyer's actions at the outset, however. Rather, Malone challenges questions that followed Hyer's interaction with the two other occupants of the vehicle, interactions that

brought to Hyer's attention objective facts that we must take into account when determining whether Hyer's conduct was reasonable.

¶ 32. Malone does not challenge Hyer's authority to ask Malone to exit the vehicle. *See Wilson,* 519 U.S. at 415. Instead, Malone's position is that once Malone was out of the vehicle, Hyer was not permitted to question him, and even if he was allowed to question him, such questioning must be reasonably related to the speeding violation of the driver or the seat belt violation that Malone may have committed.[3] Thus, the appropriate inquiry is to examine what information was available to Hyer when he asked Malone to step out of the vehicle.

¶ 33. In *Betow,* the court of appeals, relying on an Eighth Circuit case, declared:

> There is no question that a police officer may stop a vehicle when he or she reasonably believes the driver is violating a traffic law; and, once stopped, the driver

---

[3] Malone argues that the record is silent on whether the rear passenger compartment of the vehicle was equipped with a shoulder harness, and therefore Malone may not have been capable of violating the statute. Wisconsin Stat. § 347.48(2m)(d) provides:

> If a motor vehicle is required to be equipped with safety belts in this state, no person who is at least 4 years old and who is seated at a designated seating position in the front seat required under 49 CFR 571 to have a safety belt installed or at a designated seating position in the seats, other than the front seats, for which a shoulder harness has been installed may be a passenger in that motor vehicle unless the person is properly restrained.

Wis. Stat. § 347.48(2m)(d) (2001–02). However, it is irrelevant whether Malone actually violated the seat belt law. The important inquiry is whether Trooper Hyer had cause to believe that a violation had occurred. Given his observation that there was no seat belt being worn, Hyer would likely be justified in investigating the matter further.

may be asked questions reasonably related to the nature of the stop—including his or her destination and purpose.

226 Wis. 2d at 93 (citing *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)). The State takes the position that we should ratify this statement of law, and additionally import the principles of other Eighth Circuit cases addressing permissible questions for drivers as well as passengers within the scope of a valid traffic stop. The cases the State asks that we rely upon suggest that it is always permissible to ask a driver as well as the passenger about the group's travel plans.[4]

¶ 34. We decline to formulate a bright-line rule. As we previously stated, the reasonableness of searches and seizures is to be evaluated on a case-by-case basis, while the Eighth Circuit cases set forth bright-line rules. We note the difficulty in demarcating at what point in time, if ever, Hyer's conduct became unsupportable based on the justification for stopping the vehicle for speeding, or the extent to which the seat belt violations might have permitted Hyer additional leeway to question Malone. We will simply assume, without deciding, that Hyer's conduct toward Malone could not

---

[4] *See United States v. Gregory*, 302 F.3d 805, 809 (8th Cir. 2002) ("The Fourth Amendment grants an officer conducting a routine traffic stop latitude to check the driver's identification and vehicle registration, ask the driver to step out of his vehicle and over to the patrol car, inquire into the driver's destination and purpose for the trip, and 'undertake similar questioning of the vehicle's occupants to verify the information provided by the driver' "); *see also United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002); *United States v. Edmisten*, 208 F.3d 693, 694 (8th Cir. 2000); *United States v. Foley*, 206 F.3d 802, 805 (8th Cir. 2000); *United States v. Perez*, 200 F.3d 576, 579 (8th Cir. 2000); *United States v. Lyton*, 161 F.3d 1168, 1169–70 (8th Cir. 1998).

be supported based solely on the speeding and seat belt violations. In this way, we can test whether Hyer's conduct is supported by articulable suspicion of criminal conduct wholly apart from the purpose of the stop. If the conduct was justified, then we need go no further. Thus, we focus today on whether Hyer had reasonable suspicion to question Malone based on the facts that were known to Hyer at the time he asked Malone to step out of the vehicle.

¶ 35. A law enforcement officer is justified in detaining an individual if he has suspicion "grounded in specific, articulable facts and reasonable inferences from those facts, that the individual has committed a crime." *State v. Guzy,* 139 Wis. 2d 663, 675, 407 N.W.2d 548 (1987) (citing *United States v. Hensley,* 469 U.S. 221, 226 (1985); *Wendricks v. State,* 72 Wis. 2d 717, 723, 242 N.W.2d 187 (1976)). At the point where Hyer asked Malone to exit the vehicle, he was able to point to a number of specific and articulable facts to support his suspicion that the occupants of the vehicle, including Malone, might be involved in illegal activity.

¶ 36. Hyer observed an "unusual number" of air fresheners. Based upon his law enforcement training, Hyer knew that individuals involved in transporting narcotics may use air fresheners to mask odor. Combined with other facts, this correlation becomes more significant. Malone makes much of cases where the presence or scent of masking agents is held insufficient to satisfy the standards of probable cause or reasonable suspicion, either alone or in conjunction with other facts and circumstances.[5] Yet, he cites no case that

---

[5] *See, e.g., State v. Thompson,* 569 S.E.2d 254, 256 (Ga. Ct. App. 2002) (no reasonable suspicion where officer noted strong

stands for the proposition that air fresheners or masking odors may never constitute part of the totality of the circumstances.[6] In *State v. Secrist,* 224 Wis. 2d 201, 210, 589 N.W.2d 387 (1999), we noted that the "unmistakable odor of marijuana coming from an automobile provides probable cause for an officer to believe that the automobile contains evidence of a crime," thus justifying a search. The presence of seven or eight air fresheners in a vehicle occupied by three young men with an average age of 21 does not provide probable cause for the search of a vehicle, but it certainly raises suspicion and justifies reasonable inquiry.

¶ 37. After Hyer conducted a record check on the identities of the occupants in his squad car, he returned

_____

masking odor of laundry detergent and dryer sheets and defendant's nervousness); *Charity v. State,* 753 A.2d 556, 573 (Md. Ct. Spec. App. 2000) (presence of 72 air fresheners did not provide reasonable suspicion); *State v. 1983 Toyota Corolla,* 879 P.2d 830, 832–34 (Okla. Ct. App. 1994) (smell of air freshener alone did not provide reasonable suspicion); *State v. Juarez-Godinez,* 942 P.2d 772, 777 (Or. 1997) (no reasonable suspicion where Hispanic occupants were well dressed, on a long trip with no luggage, car was owned by drug offender on probation for delivery of a controlled substance, driver was nervous and unable to produce identification, and the car smelled of air fresheners); *Commonwealth v. Phinn,* 761 A.2d 176, 186 (Pa. Super. Ct. 2000) (no reasonable suspicion where officer noted a masking odor of fabric softener, saw furtive movements, and conflicting stories from vehicle occupants).

[6] The following cases permit the inclusion of the smell or presence of air fresheners in the totality of the circumstances in finding reasonable suspicion or probable cause. *See, e.g., United States v. West,* 219 F.3d 1171, 1178–79 (10th Cir. 2000); *United States v. McCoy,* 200 F.3d 582, 584 (8th Cir. 2000); *United States v. Anderson,* 114 F.3d 1059, 1066 (10th Cir. 1997); *United States v. Parada,* 289 F. Supp. 2d 1291, 1302 (Kan. 2003); *Nathan v. State,* 805 A.2d 1086, 1096 (Md. 2002).

to the vehicle and asked the driver, Moede, to step out and to the rear of the vehicle. Once outside the vehicle, Hyer asked Moede where the parties were going, and he responded that the three were heading to a family member's house in Milwaukee. Following this brief encounter with the driver, Hyer asked Marohl, the owner of the car, to exit the vehicle. Hyer asked Marohl where the group was going, and Marohl's response was inconsistent with Moede's response; indeed it constituted a radically different account of the occupants' travel plans. When the owner of a vehicle and the driver of the vehicle are taking a three-hour trip on a Wednesday evening but cannot provide a consistent account of their destination, the inconsistency creates suspicion. Moreover, because Marohl indicated that the group was on its way to a rave party, it was reasonable for Hyer to infer that the driver, Moede, was lying about the destination, and that Marohl was telling the truth. This increased the suspicion, given that Hyer knew there was a correlation between rave parties and narcotics and the inference that Moede may have been deceptive in not sharing that compromising information with Hyer.

¶ 38. In addition, Marohl's explanation for the group's travel plans was internally inconsistent. Unsolicited by any question from Hyer, Marohl followed up his answer to Hyer's first question by telling the officer that he was on probation for drug-related offenses. Marohl's statements prompted Hyer to ask whether his probation agent would find it acceptable that Marohl was attending a rave party, and Marohl promptly backtracked, asserting that it was the other two occupants of the vehicle, and not himself, who were going to the party. He offered no further explanation as to why he was traveling with the group if he was not going to the

party with them. It is reasonable for Hyer to have been suspicious given that Moede did not mention the rave party and that Marohl was evasive about his inclination to attend that party.

¶ 39. Furthermore, when Marohl volunteered that he was on probation for drug-related offenses, this served to strengthen Hyer's suspicion that the group might be involved in conduct involving narcotics. All three occupants appeared to be nervous. In sum, Hyer became aware of several specific and articulable facts providing an objective basis to believe that illegal conduct involving narcotics might be afoot before he even asked Malone to step out of the vehicle.

¶ 40. We first ask whether the nature of Hyer's questions was unreasonably intrusive. The public interest served by the questioning in this case undoubtedly comes in detecting and preventing criminal activity. *See Terry,* 392 U.S. at 22; *see also State v. Waldner,* 206 Wis. 2d 51, 56, 556 N.W.2d 681 (1996). Hyer identified a number of objective reasons for suspecting criminal activity relating to narcotics. The public interest in detecting and preventing crime is strong.

¶ 41. Against the public interest in the prevention and detection of crime, we assess the severity of Hyer's intrusion upon Malone's liberty. Malone challenges the four questions Hyer asked Malone. The subject matter of the first question was relatively benign. Hyer asked Malone about the group's destination. This question does not delve directly into matters of criminal conduct, and would help to confirm or rebut Hyer's suspicions about the group as created in part by the inconsistent answers of Malone's associates.

¶ 42. The last three questions probed potentially incriminating areas. Hyer asked about Malone's history

of tickets, whether Malone was still using drugs, and whether Malone had any drugs on him. These questions, especially the last two, are more intrusive than the first question regarding destination, and therefore constitute a more serious burden to Malone's liberty interest.

¶ 43. It should be noted that Hyer had checked Malone's record before he asked Malone any questions. The extent of Hyer's knowledge was not developed at the suppression hearing. Consequently, we do not know what Hyer knew about Malone's criminal history or traffic history. Hyer may have asked Malone if he had received any tickets in his life to test whether Malone would give a truthful answer. Malone himself did not know the extent of Hyer's knowledge. Malone gave a truthful answer that acknowledged being charged in drug-related matters. That prompted the follow-up question whether he was still using marijuana and an admission from him that he was. And that led to the question whether he had any drugs on him and the consent to conduct a pat-down search. Before Hyer asked Malone the second question, Malone had told him he didn't know the family they were going to see; he was just along for the ride. This again was an inconsistent, implausible answer, spurring an additional question.

¶ 44. On balance, Hyer's conduct toward Malone was reasonable when viewed in light of the objective indications that criminal narcotics activity might be afoot: (1) the presence of an abnormal number of air fresheners, which may be used to mask the odor of narcotics; (2) the radically different accounts of the group's travel plans; (3) Marohl's statement that the group was headed to a rave party, which the driver may have attempted to conceal from the officer; (4) the

nervousness of the driver and the passengers, e.g., putting their hands in and out of their pockets; and (5) the other passenger's unsolicited statement that he was on probation for a drug-related offense. The nature of the intrusion—that is, the subject matter of the questions—lined up with Hyer's suspicion and was supported by a number of specific and articulable facts, which, under the totality of the circumstances, suggested that the group might be involved in narcotics. Though Hyer asked somewhat intrusive questions, Hyer's reasonable level of suspicion justified these questions. Accordingly, we conclude that Hyer's conduct in posing these four questions to Malone was reasonable under the circumstances.

## D. Duration of Seizure

¶ 45. Duration is a second factor to consider in evaluating whether Trooper Hyer's conduct in "seizing" Malone and subsequently questioning him was unreasonable under the Fourth Amendment. As we noted in *Griffith,* "questioning can transform a reasonable seizure into an unreasonable one if it extends the stop beyond the time necessary to fulfill the purpose of the stop." 236 Wis. 2d 48, ¶ 54 (citing *Sharpe,* 470 U.S. at 684–85). The original purpose of the stop was to investigate the traffic violation. The purpose of the stop was transformed as Hyer became aware of additional information that justified expanding his investigation to pursue his reasonable suspicion that the occupants of the vehicle might be committing or about to commit a crime involving narcotics. Thus, Hyer had a new purpose—to investigate his suspicion regarding crimi-

nal activity. However, Hyer's lawful authority to pursue his suspicion of criminal activity did not mean that the stop could last indefinitely.

¶ 46. Malone does not claim that either the overall length of time or the length of time Hyer questioned Malone exceeded the outer limits of the Fourth Amendment. Rather, we understand Malone to argue that *any* extension of the stop was unjustified. We disagree. Malone fails to present an alternative argument regarding the permissible length of the detention if we were to find that Hyer was justified in pursuing his suspicion of criminal activity in a reasonable manner. Because Malone does not address this issue, neither do we.

## IV. CONCLUSION

¶ 47. We conclude that the law enforcement officer's conduct vis-à-vis Donavan Malone was reasonable both in its scope and length, and therefore affirm the circuit court's decision denying Malone's motion to suppress. Assuming the law enforcement officer's conduct with respect to the defendant in this case exceeded that justified by the initial stop, the brief detention of the defendant for questioning was permissible because the officer developed reasonable suspicion that criminal activity was afoot. Thus, when the officer questioned the defendant, his actions were reasonable. Accordingly, we affirm.

*By the Court.*—The judgment of the circuit court is affirmed.

All work on this opinion was completed on or before June 30, 2004. Justice Diane S. Sykes resigned on July 4, 2004.