ANN WALSH BRADLEY, J.

{dissenting).

¶ 44. The court of appeals acknowledged that the question of reasonable suspicion here "is a very close call." State v. Floyd, 2016 WI App 64, ¶ 16, 371 Wis. 2d 404, 885 N.W.2d 156.1 land on one side of the line and the court of appeals' decision falls on the other.
¶ 45. Rather than focus on the "close call" of reasonable suspicion, the majority avoids it entirely. Instead, it focuses primarily on the case specific fact of whether Floyd gave actual consent to the search. Majority op., ¶ 29 ("[W]hen a person consents, the Fourth Amendment does not bar the search . . . .").
¶ 46. The majority concludes that the traffic stop was not extended because Mr. Floyd freely and voluntarily consented to the search. Majority op., ¶ 34. It then determines that there is no need to consider whether there was reasonable suspicion because it has already concluded that the traffic stop was not extended. Id.
¶ 47. Yet, the strictures of the Fourth Amendment remain. If the stop was unlawfully extended, then the consent was likewise unlawful.
*426 ¶ 48. I write separately not merely because I disagree with the court of appeals as to where the line should be drawn under the facts of this case. Rather, I write also to express my concern that the majority opinion, in lockstep with this court's jurisprudence, continues the erosion of the Fourth Amendment. It is through such erosion that implicit bias and racial profiling are able to seep through cracks in the Fourth Amendment's protections.
¶ 49. Because I conclude that the traffic stop was extended beyond what was reasonably necessary to complete its mission and because I determine that there was no articulable reasonable suspicion of additional illegal activity to otherwise justify the extension, I respectfully dissent.
J-H
¶ 50. The Fourth Amendment to the Unites States Constitution provides that "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . As the United States Supreme Court has observed, "[n]o right is held more sacred, or is more carefully guarded . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference by others, unless by clear and unquestionable authority of law." Union Pac. R. Co. v. Botsford, 141 U.S. 250, 251 (1891).
¶ 51. Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of personal liberty interests. Ker v. State of Cal., 374 U.S. 23, 32 (1963). Indeed, the Fourth *427 Amendment "is to be liberally construed and all owe the duty of vigilance for its effective enforcement lest there shall be impairment of the rights for the protection of which it was adopted." Id. at 33 (quotations and citation omitted).
¶ 52. In this case, we address the Fourth Amendment's protection against unreasonable searches and seizures in the context of a traffic stop. "A routine traffic stop ... is a relatively brief encounter and 'is more analogous to a so-called "Terry stop" . . . than to a formal arrest.' " Knowles v. Iowa, 525 U.S. 113, 117 (1998).
¶ 53. A Terry stop is a brief investigatory seizure of an individual based on an officer's reasonable and articulable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 20-21 (1968). Balancing public safety and personal liberty, the Terry court required that an investigative stop be based on "specific and articulable facts, which, taken together with rational inferences from those facts, warrant that intrusion." Id. at 21.
¶ 54. The Terry doctrine sprouted from the blatantly suspicious behavior of two would-be jewelry thieves. Id. at 5. Over the course of an afternoon, the defendants in Terry took turns walking past a jewelry store, peering inside, and then returning to their original spot on a nearby street corner. Id.
¶ 55. Based on this pattern of behavior and thirty years of experience detecting thievery in the neighborhood, the police officer in Terry suspected that the men were "casing" the store. Id. Believing that a "stick-up" was imminent and knowing that "American criminals have a long tradition of armed violence," the officer seized and searched the men. Id.
*428 ¶ 56. Given these particularized facts, the Terry court concluded that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the person with whom he is dealing may be armed and presently dangerous ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search . . . ." Id. at 30. Under Terry, the inquiry focused on the officer's "reasonable fear for his own or others' safety" and allowed "a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." Id.
¶ 57. This court, in State v. McGill, 2000 WI 38, ¶ 21, 234 Wis. 2d 560, 609 N.W.2d 795, explained that "Terry does not. . . authorize officers to conduct a protective frisk as a part of every investigative encounter." Accordingly, "Terry limits the protective frisk to situations in which the officer is 'justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others.' " Id. (citing Terry, 392 U.S. at 24).
f 58. In this case, we consider Terry in the context of a traffic stop. When a traffic stop concludes or is extended beyond what is reasonably necessary to complete its mission, continued seizure becomes unlawful. Illinois v. Caballes, 543 U.S. 405, 407 (2005); Rodriguez v. United States, 135 S. Ct. 1609, 1614-15 (2015). An officer may expand the scope of the inquiry "only to investigate 'additional suspicious factors [that] come to the officer's attention.' " State v. Hogan, 2015 WI 76, ¶ 35, 364 Wis. 2d 167, 868 N.W.2d 124 (quoting State v. Betow, 226 Wis. 2d 90, 94, 593 N.W.2d 499 (Ct. App. 1999)).
*429 f 59. Like a Terry stop, the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's "mission," which is to address the traffic violation that warranted the stop and attend to related safety concerns. Rodriguez, 135 S. Ct. at 1614. On-scene investigation into other unrelated crimes deviates from the mission of the stop. Id. at 1616. "So too do safety precautions taken in order to facilitate such detours." Id.
¶ 60. Indeed, even a de minimus extension that is not made in furtherance of the mission of the traffic stop is an unlawful extension. Id. As the Rodriguez court explained, common seizure techniques may unlawfully extend a stop when they are employed for reasons beyond the scope of the original stop. Id.
¶ 61. Having set forth the law that is to guide our inquiry, I turn now to the facts of this case.
1—1
¶ 62. Deputy Ruffalo ran Floyd's license plate at a stoplight and discovered that the vehicle's registration was suspended for an emissions violation. During this initial contact, the deputy asked for Floyd's license and insurance information. Floyd'did not have either, but provided a Wisconsin identification card. The deputy returned to his squad car and asked dispatch if a canine unit or "cover squad" was available while also processing citations for the registration, license, and insurance violations.
f 63. The dispatcher informed the officer that a canine unit was not available, but that a patrol officer would arrive to serve as a "cover squad." When the second officer arrived at the scene, the deputy explained that he wanted to have Floyd exit the car *430 because he "had some indications that there might be some criminal activity going on in the vehicle as well as explain the citations to him."
¶ 64. After the second officer arrived, the deputy returned to Floyd's vehicle and asked him to get out of the car. Floyd complied and the deputy then asked him if he had any weapons. Floyd stated that he did not have any weapons. The deputy then either asked for Floyd's consent to conduct a weapons pat down or advised Floyd that he was going to conduct a weapons pat down.[1]
¶ 65. According to the deputy's testimony at the suppression hearing, he "assume[s] everybody has a weapon, everyone I come in contact with." He further testified that every time he asks a driver to step out of the vehicle, the first thing he does is ask if he can search them.
¶ 66. The deputy patted Floyd down and found a bag containing a small amount of marijuana and 15 pills of Vicodin. Floyd filed a motion to suppress this evidence, arguing that the deputy illegally extended the stop and searched his person without his voluntary consent.
¶ 67. At the suppression hearing, the deputy testified that he had reasonable suspicion to request a canine unit and a backup officer based on the following factors:
• Floyd was from Kenosha, WI;
• Floyd was alone in his vehicle;
*431 • The time of day (6:45 p.m. during the summer);
• Floyd was stopped in a high crime area;
• Floyd's car had air fresheners in every vent; and
• The vehicle's windows were tinted.
Relying on these factors as a basis for reasonable suspicion, the circuit court denied Floyd's motion to suppress.
I—I hH I—I
f 68. In applying the law to the above facts, I begin with an examination of whether there was reasonable and articulable suspicion as to whether criminal activity was afoot. I address next whether the traffic stop was extended beyond the scope of the mission.
¶ 69. I quickly dispatch with the first three factors proffered as support for reasonable suspicion because they border on the ridiculous. If residing in Kenosha can serve as a factor supporting reasonable suspicion that criminal activity is afoot, then lord help us (and Kenosha). Likewise, warnings should issue to all of those who drive alone in their vehicle, lest it serve as a basis for a traffic stop. Finally, the assertion that the time of 6:45 p.m. during the summer can serve as a factor for reasonable suspicion is bewildering.
¶ 70. At the outset the first three factors fail because they are simply unpersuasive in fact. The next three factors fail because they are also unpersuasive under the law.
¶ 71. It is well established that "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure." United States v. *432 Martinez-Fuerte, 428 U.S. 543, 560 (1976). Thus, "circumstances must not be so general that they risk sweeping into valid law-enforcement concerns persons on whom the requisite individualized suspicion has not focused." State v. Gordon, 2014 WI App 44, ¶ 12, 353 Wis. 2d 468, 846 N.W.2d 483.
¶ 72. This case raises concern regarding whether generic and innocent factors may support reasonable and articulable suspicion without the presence of particularized behaviors or characteristics. Take, for example, the fact that the deputy stopped Floyd in a high crime area. As this court has recognized, "many persons 'are forced to live in areas that have "high crime" rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas.'" State v. Morgan, 197 Wis. 2d 200, 212, 539 N.W.2d 887 (1995) (quoting People v. Bower, 597 P.2d 115, 119, (Cal. 1979)).
¶ 73. In Illinois v. Wardlow, the Unites States Supreme Court reasoned that "it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion but his unprovoked flight upon noticing the police." 528 U.S. 119, 124 (2000). It instructed that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." Id. Importantly, the Wardlow court did not just consider the generic factor of the location of the stop, but also the defendant's individualized flight behavior supporting reasonable suspicion. Id.
¶ 74. Likewise, when considering the presence of "an unusual number" of air fresheners in a vehicle, this court determined that when "combined with other *433 facts," this may raise suspicion and justify further inquiry. State v. Malone, 2004 WI 108, ¶ 36, 274 Wis. 2d 540, 683 N.W.2d 1. As in Wardlow, however, the other facts considered by the Malone court involved particularized conduct and circumstances.
¶ 75. When the defendants' vehicle in Malone was stopped for speeding, the occupants appeared nervous and gave inconsistent accounts of where they were going. Id., ¶¶ 36-39. Additionally, one occupant said that the group was en route to a rave party and that he was on probation for drug charges. Id.; see also Rodriguez, 135 S. Ct at 1622-23 (noting the presence of individualized circumstances in addition to air fresheners, such as driving onto the shoulder of the road, the nervousness of the passenger, and the passenger's improbable explanation of the travel itinerary).
¶ 76. Finally, legally tinted windows ought not be a factor when considering whether the totality of the circumstances support a finding of reasonable suspicion. See, e.g., United States v. Diaz, 977 F.2d 163, 165 n.5 (5th Cir. 1992). Indeed, tinted windows are the epitome of a generic and innocent factor. As the court of appeals acknowledged here, "a significant portion of the population purchases vehicles with tinted windows for completely lawful reasons, including a desire to protect the interior of the vehicle from the sun and for greater privacy of innocent occupants." Floyd, 371 Wis. 2d 404, ¶ 16 n.3. Although it may have been a relevant factor before tinted windows became commonplace, it no longer is today.[2]
*434 ¶ 77. Equally important to the factors that were present in this case (a high crime area, air fresheners, and tinted windows) are the factors that were absent. There is no evidence in the record that Floyd exhibited any particularized behaviors that factored into the totality of the circumstances here. Unlike in Wardlow and Malone, there is no testimony of flight or that Floyd was nervous or evasive. Indeed, Deputy Ruffalo testified at the suppression hearing that Floyd was compliant and cooperative with his orders and that Floyd made no furtive movements at any point during the initial portion of the stop.
f 78. Ultimately, I part ways with the court of appeals because all of the factors relied upon by the deputy are either baseless or are generic and innocent factors. Additionally, the record in this case is devoid of any particularized conduct or circumstances that would support reasonable and articulable suspicion that criminal activity is afoot.
f 79. Absent such reasonable and articulable suspicion, the extension of the stop was unlawful. Pursuant to Rodriguez, "the tolerable duration of police inquiries in the traffic stop context is determined by the seizure's 'mission,'" which is to address the traffic violation that warranted the stop and attend to related safety concerns. 135 S. Ct. at 1614. Neither calling dispatch for a canine unit nor calling and waiting for backup was done in furtherance of the *435 mission of the stop. This began the stop's extension and set the stage for the later chronological delays of the exit order and request for consent to search.
¶ 80. Even a de minimus extension that is not made in furtherance of the mission of the traffic stop is an unlawful extension. Id. Not only was involving a second officer beyond the scope of the traffic stop, but the deputy specifically testified that he did not want to order Floyd out of his vehicle or request consent to search until after the "cover squad" had arrived. See id. (explaining that an investigation into other crimes deviates from the mission of the stop, as do safety precautions taken in order to facilitate such detours). By the time that the deputy ordered Floyd out of his vehicle and reportedly requested consent to search, the scope of the stop had been extended beyond its original mission—to issue Floyd a citation for a suspended registration due to an emissions violation.
¶ 81. Contrary to the majority, I do not address the issue of whether Floyd voluntarily consented to the search. In fact, the majority's reliance on consent is misplaced. "Consent, even when voluntary, is not valid when obtained through exploitation of an illegal action by the police." Hogan, 364 Wis. 2d 167, ¶ 57. When consent to search is obtained after a Fourth Amendment violation, evidence seized as a result of that search "must be suppressed as 'fruit of the poisonous tree' unless the State can show a sufficient break in the causal chain between the illegality and the seizure of evidence." Id. (citation omitted). The State has made no such showing here.
¶ 82. In sum, I conclude that the traffic stop was extended beyond what was reasonably necessary to complete its mission. Further, I determine that there *436 was no reasonable and articulable suspicion of additional illegal activity to otherwise justify the extension.
>
I 83. I turn now to address my concerns about the erosion of the Fourth Amendment that may give rise to implicit bias and racial profiling.
A
f 84. We've come a long way since Terry v. Ohio, but we're headed in the wrong direction. Originally intended to prevent crime and protect officers through investigatory stops and protective frisks based on reasonable and articulable suspicion, Terry's legacy is becoming a progression of thinly veiled refusals to meaningfully check the exercise of police power.
f 85. The continual dilution of Terry has led this court far astray from individualized suspicion. The individualized facts in Terry stand in stark contrast to the generic and innocent factors present in this case. In Terry, the blatantly suspicious behavior of two would-be jewelry thieves supported reasonable suspicion after they spent an afternoon taking turns walking past a jewelry store and peering inside. Here, the traffic stop extension was justified not on the basis of any particularized behavior, but on factors that might be present in any case.
¶ 86. Although this court routinely pays homage to the importance of Fourth Amendment protections, it appears often to be only lip service. See, e.g., State v. Dumstrey, 2016 WI 3, ¶ 22, 366 Wis. 2d 64, 873 N.W.2d 502 (" [I]t is axiomatic that the physical entry of the home is the chief evil against which the wording of *437 the Fourth Amendment is directed.") (quotations and citations omitted); State v. Kozel, 2017 WI 3, ¶ 40 ("Virtually any intrusion[n] into the human body will work an invasion of cherished personal security that is subject to constitutional scrutiny.") (quotations and citations omitted).
¶ 87. In the last two terms, this court is batting nearly zero when it comes to upholding Fourth Amendment challenges in criminal cases. Even if the challenge initially meets with success, it ultimately loses because of an asserted subsequent consent, or community caretaker exception or inevitable discovery rule, or whatever.[3]
*438 ¶ 88. The Fourth Amendment's protections, particularly its warrant requirement, are not some left over relics of the 18th century. Rather, they are as vital today as when they were created. Yet, I have concerns that the Fourth Amendment's right of freedom from warrantless search and seizures has become a second class right, or worse, meaningless prose.
¶ 89. The Fourth Amendment is intended to provide a check on the unbridled exercise of police power. It grew out of a demand that search and seizure powers be restrained. The amendment presents a reasonable yet delicate balance between the exercise of police power against the exercise of personal liberty. Courts are imbued with the responsibility to oversee this balance and to provide this check—not a blank check.
B
¶ 90. Having addressed the erosion of the Fourth Amendment and the dilution of the Terry doctrine, I turn to the concern that this trajectory may be allowing implicit bias and racial profiling to seep through cracks in the Fourth Amendment's protections. Indeed, amicus in this case advances that the requirement that reasonable suspicion be supported by individualized, particularized circumstances discourages the use of generic and innocent factors. It contends that such *439 factors perpetuate and magnify the effects of implicit racial bias.[4] As one commentator explained, Terry's focus on individualized facts can be viewed as a "commitment and promise to minority communities around the nation that the Supreme Court was seriously concerned about police practices which rode roughshod over individual rights." Gregory Howard Williams, The Supreme Court and Broken Promises: The Gradual hut Continual Erosion of Terry v. Ohio, 34 Howard L. J. 567, 576 (1991).
¶ 91. In his concurring opinion in the court of appeals, Judge Reilly also raised the concern that the trajectory of our Fourth Amendment jurisprudence "has tacitly accepted the profiling of suspects in the application of our reasonable suspicion test." Floyd, 371 Wis. 2d 404, ¶ 29-30 (Reilly, J., concurring). He provided the following example:
Applying the Floyd facts to the 'objectively reasonable suspicion' test dictates that a white, suburban, soccer mom from Kenosha, driving alone at 6:45 p.m. in the month of July near the S.C. Johnson plant in Racine, Wisconsin, with multiple air fresheners (perhaps to mask the smell of old happy meals, spilled milk, and soiled athletic gear), and tinted windows (to protect the privacy of her children) evidences reasonable suspicion that she is involved in drug-related criminal activity. Substitute young, black male for soccer mom in this hypothetical and we have the facts of this case.
Id. He further cautioned that:
The issue is whether we as a judicial system have tacitly accepted, condoned, and blessed the profiling of our citizens by taking age and color of skin into the *440 'objectively reasonable suspicion test' in order to combat crime. An effective judicial system must be true to its ideals; ideals which rest upon the constitutional protection against unreasonable government searches and seizures regardless of age or skin color.
Id. I share Judge Reilly's concern and join in his caution.
f 92. For the reasons set forth above, I respectfully dissent.
¶ 93. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.

 Officer White, the second officer at the scene, wrote in his original report that Deputy Ruffalo "advised" Floyd that he would conduct a weapons search. He testified that his report was accurate, but later testified that the deputy asked Floyd's consent to conduct a search.

 In writing this footnote, I observe the ten vehicles parked outside the State Capitol Building beneath my chamber's window. They include a Volvo, Mercedes, Plymouth, Chrysler, Ford, Nissan, Hyundai, Lexus, Kia and Chevrolet. All of the *434 vehicles, save the Nissan, have noticeably tinted windows. Indeed, all of the vehicles belong to elected public officials or their staff. Once upon a time, tinted windows may have been a useful factor to establish reasonable suspicion that criminal activity was afoot. Because of the omnipresence of legally tinted windows, that time has long since passed. For further details regarding what constitutes an illegally tinted window, see Wis. Admin. Code Trans. 305.32 and 305.34.

 Fourth Amendment challenges in criminal cases include: State v. Howes, 2017 WI 18, 373 Wis. 2d 468, 893 N.W.2d 812 (a warrantless blood draw was constitutional under the exigent circumstances exception); State v. Kozel, 2017 WI 3, 373 Wis. 2d 1, 889 N.W.2d 423 (a warrantless blood draw was lawful because the EMT who drew the blood was acting under a physician's direction, the blood was drawn in a constitutionally reasonable manner, and the defendant did not object to the blood draw); State v. Weber, 2016 WI 96, 372 Wis. 2d 202, 887 N.W.2d 554 (an officer's entry into the defendant's garage was constitutionally reasonable under the hot pursuit exception); State v. Jackson, 2016 WI 56, 369 Wis. 2d 673, 882 N.W.2d 422 (the inevitable discovery doctrine applied because those portions of the warrant affidavit that were not tainted established constitutionally sufficient probable cause to search the residence); State v. Parisi, 2016 WI 10, 367 Wis. 2d 1, 875 N.W.2d 619 (a warrantless blood draw was constitutional under the exigent circumstances exception); State v. Matalonis, 2016 WI 7, 366 Wis. 2d 443, 875 N.W.2d 567 (a warrantless search of a home was constitutional pursuant to the community caretaker exception); State v. Dumstrey, 2016 WI 3, 366 Wis. 2d 64, 873 N.W.2d 502 (the locked parking garage underneath the defendant's building was not curtilage and therefore the officer's warrantless entry before the seizure did not occur in a constitutionally protected area); State v. Iverson, 2015 WI 101, 365 *438 Wis. 2d 302, 871 N.W.2d 661 (an officer may constitutionally conduct a traffic stop for non-traffic civil forfeitures that do not constitute crimes); but see State v. Blackman 2017 WI_,_ Wis. 2d _, _ N.W.2d _ (declining to apply the good faith exception to the exclusionary rule). For a more comprehensive history of this court's Fourth Amendment decisions, see http://www.scowstats.com/2015/06/22/how-effective-are-fourth-amendment-arguments-in-the-wisconsin-supreme-court/.

 The Office of the Wisconsin State Public Defender filed a helpful amicus brief.