# Supreme Court of Wisconsin

| | |
|---|---|
| CASE NO.: | 2015AP656-CR |
| COMPLETE TITLE: | State of Wisconsin, <br>         Plaintiff-Respondent-Petitioner, <br>     v. <br> Patrick K. Kozel, <br>         Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | January 12, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 18, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Sauk |
|   JUDGE: | Guy D. Reynolds |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   DISSENTED: | BRADLEY, A. W., J. dissents, joined by ABRAHAMSON, J. (Opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner the cause was argued by *Michael C. Sanders*, assistant attorney general, with whom on the brief was *Brad D. Schimel*, attorney general.

For the defendant-appellant, there was a brief by *Tracey A. Wood*, *Sarah Schmeiser* and *Tracey Wood and Associates,* Madison, and oral argument by Tracey A. Wood.

**2017 WI 3**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP656-CR
(L.C. No. 2013CT499)

STATE OF WISCONSIN : IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent-Petitioner,

  v.

Patrick K. Kozel,

      Defendant-Appellant.

**FILED**

**JAN 12, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J.  This is a review of an unpublished decision of the court of appeals, State v. Kozel, No. 2015AP656-CR, unpublished slip op. (Wis. Ct. App. Nov. 12, 2015), which reversed the Sauk County circuit court's[1] judgment of conviction of defendant Patrick K. Kozel ("Kozel") and remanded the case to the circuit court to suppress evidence of drunk driving obtained from a sample of Kozel's blood. Kozel, unpublished slip op., ¶1.

---

[1] The Honorable Guy D. Reynolds presided.

¶2  After being arrested for drunk driving, Kozel was taken to the Sauk County jail where he agreed to have his blood drawn.  In a clean room at the jail, an emergency medical technician ("EMT") trained in drawing blood and acting at the request of law enforcement used a new blood draw kit containing a sterile needle to take samples of Kozel's blood.  The EMT was authorized in writing by a physician to draw blood when asked to do so by law enforcement.  Kozel argues that the results of testing of his blood must be suppressed because the EMT who drew Kozel's blood was not a "person acting under the direction of a physician" as required by statute, Wis. Stat. § 343.305(5)(b) (2011-12),[2] and because the blood draw was taken in a constitutionally unreasonable manner under the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution.

¶3  We conclude that the EMT who drew Kozel's blood was a "person acting under the direction of a physician," Wis. Stat. § 343.305(5)(b),  and  that  Kozel's  blood  was  drawn  in  a constitutionally reasonable manner.  Accordingly, we reverse the decision of the court of appeals.

I.  FACTUAL BACKGROUND

¶4  On August 20, 2013, at about 2:10 a.m., while "sitting stationary" at the Greenfield Town Hall in Sauk County, Wisconsin, Deputy Brian Slough ("Deputy Schlough") of the Sauk

_____

[2] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

County sheriff's department allegedly observed a vehicle make a wide right turn onto Bluff Road. Deputy Schlough began following the vehicle. Bluff Road is a relatively "narrow," "hilly" roadway "with several curves," and there are no lane markers on the road. According to Deputy Schlough, the ditches on either side of the road are "very steep" at certain locations and "a creek . . . runs along the road" at various points, so the road is somewhat dangerous. According to Deputy Schlough's testimony, the vehicle Deputy Schlough was following drove across the road and almost into the ditch on the east side of the road, and more than once the vehicle drove into the ditch on the west side of the road. After following the vehicle for about half of a mile, Deputy Schlough stopped the vehicle and spoke with its driver, Kozel.

¶5 Kozel "had difficulty retrieving" his driver's license from his wallet, and Deputy Schlough eventually obtained the license for him. Deputy Schlough noticed that Kozel had "bloodshot, glassy" eyes and the deputy smelled "a strong odor of intoxicants coming from the vehicle." Kozel's speech was slurred. Upon questioning, Kozel informed Deputy Schlough that he was traveling from Black River Falls and that he had consumed two beers. Deputy Schlough returned to his vehicle whereupon he learned that Kozel had a prior conviction for operating while intoxicated. Deputy Schlough decided to have Kozel perform field sobriety tests and went back to Kozel's vehicle.

¶6 Deputy Schlough asked Kozel to exit his vehicle and once again asked him "how much he had to drink and where he was

3

coming from." This time, Kozel replied that "he was coming from a friend's house in Baraboo and that he had three 12-ounce cans of Budweiser." Deputy Schlough asked Kozel if he had any physical or medical problems, and Kozel stated that he did not. Kozel did not perform well on the field sobriety tests. Deputy Schlough then administered a preliminary breath test; Kozel blew a 0.17, that is, the preliminary breath test results were well in excess of the 0.08 legal limit. See Wis. Stat. § 340.01(46m) (2013-14). Deputy Schlough placed Kozel in handcuffs and under arrest. Kozel was then taken to the Sauk County jail.

¶7 At the jail, Kozel agreed to have his blood drawn. At 3:20 a.m., Matthew Goethel ("Goethel"), an EMT employed by Baraboo District Ambulance Service ("BDAS"), conducted the blood draw, obtaining two specimens. Testing by the Medical Toxicology Section of the Wisconsin State Laboratory of Hygiene showed a blood ethanol level of 0.196, again, well in excess of the legal limit of 0.08. See Wis. Stat. § 340.01(46m) (2013-14).

## II. PROCEDURAL BACKGROUND

¶8 On October 7, 2013, a criminal complaint was filed against Kozel in Sauk County circuit court charging him with one count of operating a motor vehicle while intoxicated, contrary to Wis. Stat. § 346.63(1)(a) (2013-14), second offense, see Wis. Stat. § 346.65(2)(am)2. (2013-14), and one count of operating with a prohibited alcohol concentration, contrary to Wis. Stat. § 346.63(1)(b) (2013-14), second offense, see Wis. Stat. § 346.65(2)(am)2. (2013-14). On November 5, 2013, Kozel filed

4

motions to suppress evidence obtained as a consequence of Deputy Schlough's stop and detention of Kozel and to suppress the results of the analysis of Kozel's blood.

¶9 On June 23, 2014, a hearing was held on the suppression motion pertaining to the traffic stop initiated by Deputy Schlough. The circuit court orally denied the motion. On June 27, 2014, the court entered an order to the same effect.

¶10 On September 26, 2014, a hearing was held on the suppression motion pertaining to the draw of Kozel's blood. Kozel made two primary arguments relevant to this appeal: (1) his blood was not taken by a person statutorily authorized to do so, namely a "person acting under the direction of a physician," Wis. Stat. § 343.305(5)(b); and (2) his blood was taken in a constitutionally unreasonable manner, see U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . .").

¶11 In order to meet these claims, the State called Goethel, the EMT who had drawn Kozel's blood, to testify at the hearing. Questioning of Goethel provided the following relevant pieces of information.

¶12 Goethel testified that he had been employed as an EMT intermediate technician by BDAS since September of 2005. This position is "a level of licensure set forth by the Wisconsin [Department of Health Services] that allows [Goethel] to, upon completion of appropriate and successful training, . . . provide certain skills and perform various procedures." Goethel was

5

"certified in [cardiopulmonary resuscitation] through the American Heart Association" and had taken "three certification classes to allow [him] to [reach his] current level of licensure," as well as "additional trainings as they are required and/or available." He was "certified by the National Registry of Emergency Medical Technicians as an advanced EMT."

¶13 When asked "[w]hat kind of things . . . [he] do[es]" in his work for BDAS, Goethel replied that he "[r]espond[s] to 911 calls, interfacility transfers, perform[s] legal blood draws, PR events, general education and training." He takes care of people "who are sick and in an emergency setting." Goethel "can perform splinting for possible fractures, spinal immobilization, medical and trauma assessments, establishment of intravenous lines, the administration of several different medications by various routes and . . . also mak[e] transport decisions."

¶14 As of August of 2013, Goethel was both licensed and certified by the State of Wisconsin to "perform legal blood draws" and had drawn blood between 100 and 150 times, not including practice draws he had performed. Goethel had been performing legal blood draws since June of 2009 under the supervision of Dr. Manuel Mendoza ("Dr. Mendoza"), a physician licensed in the State of Wisconsin who is the "medical director" of BDAS. Dr. Mendoza had been serving in that position since before Goethel joined BDAS. Goethel explained that as medical director, Dr. Mendoza "signs off on not only our licenses, which

6

allow us to practice medicine, but also any of the additional training and/or procedures that require approval."

¶15 The State introduced into evidence, in the words of Goethel, "[A] letter from Dr. Mendoza to our staff, our administration stating that the authorized EMT paramedics and intermediate technicians may perform legal blood draws."[3] According to Goethel, the letter was "current" and "was issued to [Goethel] via [his] training director [at BDAS] at the time." The letter states as follows (typographical errors have not been corrected):

August 21, 2009

To Whom It May Concern:

As Medical Director for Baraboo District Ambulance Service, I have authorized a standing order for the EMT-Paramedics and approved EMT-Intermediate Technicians authority to draw legal blood draws at the request of the law enforcement officers.

The Baraboo District Ambulance Service EMT-Paramedics and EMT-Intermediate Technicians are acting under the direction of my physician license.

They have all completed extensive training regarding the procedures and legalities of obtaining blood draws. If you have any questions regarding this manner, please do not hesitate to contact me.

Best regards,

[signature]

Manuel Mendoza, M.D.
Medical Control for Baraboo District Ambulance Service

---

[3] Kozel's attorney objected to introduction of the letter. The circuit court overruled the objection.

7

St. Clare Hospital
[address]
Baraboo, WI, 53913
[phone number]

¶16 Goethel was "personally familiar" with Dr. Mendoza, and Dr. Mendoza occasionally appeared at Goethel's place of work. Goethel agreed that Dr. Mendoza "give[s] trainings and just in general ways supervise[s]" him. Goethel was certified but not trained by Dr. Mendoza. Dr. Mendoza did not "test [Goethel] or have [him] do [any] procedures for him"; "he simply reviewed [Goethel's] certification." Dr. Mendoza had never observed Goethel performing a blood draw at the jail. Although Dr. Mendoza had never "personally told [Goethel] that [it] is okay for [Goethel] to draw blood at the jail," Goethel testified that Dr. Mendoza "is aware" that blood draws occur at the jail. "All of the legal blood draws [Goethel] [had] performed ha[d] been at the Sauk County Jail."

¶17 Goethel agreed with the defense that it is "possible for a person to have medical issues that would affect a blood draw," and that there is "the potential" for "some medical issues [to] have a serious effect." But during a blood draw, Goethel could contact Dr. Mendoza "[i]mmediately via cell phone," and if Dr. Mendoza "were not available" Goethel could contact "the on-duty physician at the St. Clare Hospital emergency department." According to Goethel, there is always an emergency doctor on call there. On cross-examination, Goethel clarified that his "first point of contact would be the emergency room doctor." In the event of an emergency,

8

Dr. Mendoza could be contacted by telephone for assistance, and emergency room doctors were also available.

¶18 Goethel is regularly in contact with the emergency department, "providing basic information on why [BDAS] had contact with the patient and what interventions and procedures [BDAS] performed," asking "any questions," and speaking with them if BDAS "needed additional approval to do certain interventions or provide certain medications." "[I]f somebody had to be transported to the hospital," it could "be done quickly." If Goethel ever were "in over [his] head," he "could . . . call someone." Finally, if someone "experienc[ed] a heart problem," Goethel himself could "be of assistance to them" because he "ha[s] training in that." On cross-examination Goethel granted that "[p]ossibly" a person experiencing such an issue would "receive faster treatment if [the parties] were at the emergency room already." Likewise, Goethel conceded that "in some circumstances . . . there are specific interventions that can occur at the emergency room that cannot occur at the jail."

¶19 Goethel testified that he performed blood draws at the Sauk County jail in Baraboo in "a small room" he "refer[s] to as the prebooking area" which is "approximately eight feet by 12 feet." Goethel uses the room "at least once or twice a month." When asked about the room's contents, Goethel explained:

> On one side is a chair that's equipped with armrests, very typical of what you would see at a medical clinic or a hospital. There is a Breathalyzer machine, which I have no use for.

9

> There are various shelves and stacks of paperwork. Additionally this is the location where the unused and new legal blood draw kits are stored.

The room "appears clean" and "well-lit." Goethel knew that the room was cleaned "regularly" because there is "a sign or chart on the wall indicating when jail staff have come through to perform janitorial duties." Goethel had never "noticed [the] room to be dirty" before drawing an individual's blood in it, and the room has never "looked any dirtier than an emergency room" to Goethel. The floor "look[s] comparable to what [Goethel] would see in an emergency room." The chair in the room is "designed for drawing blood," and its armrests "are specific for drawing blood." The chair is either "the type of chair [one] might find in the emergency room" or "very close by [sic]"; it "look[s] similar to the chair in the emergency room." Goethel has never "noticed [the] chair to be dirty."

¶20 If Goethel ever "noticed anything that was dirty about the room," he could "contact the jail" and they would "fix it" "immediately." Goethel testified that although the room was not sterile, neither are emergency rooms. He had never heard of anyone from whom he had drawn blood in the jail acquiring an infection due to the blood draw. When asked whether Dr. Mendoza had "ever inspected the blood draw location at the jail," Goethel stated, "Not to my knowledge."

¶21 The blood draw kits in the room are also clean. The kits contain a "butterfly needle" that is sterile "[w]hile it is still in the package." The needle "comes packaged" and "no one else has had [the] needle in them." When the package is opened,

that "let[s] air in and that means it's no longer sterile," but "that would be true in the emergency room as well."

¶22 Goethel agreed with the State that he had "been doing continual training on how to draw blood" and explained that he had been trained to draw blood by "several . . . individuals," including

> [D.C.] from then known as the Madison Area Technical College, former captain [J.H.] who was our former training director. Additionally [D.P.], who is a former critical care paramedic on our staff, and then my appropriate training via the Madison Area Technical College, to which I'm licensed as an intermediate technician, and then also my training as an advanced EMT.

Goethel testified that all of the classes are certified.

¶23 Goethel set forth the procedures for drawing blood which he had been trained to follow in some detail:

> Initially I start -- within the blood draw kit itself there are a couple of glass, we call them Vacutainer tubes, it's a vacuum-charged glass tube, those are held off to the side until we're completely ready to draw.

> I will have affixed a tourniquet usually above what's known as the antecubital space where you think of the inside of your elbow. That's tightened down. The space, the antecubital space, will be cleansed with an alcohol-free swab in what's known as an aseptic technique.

> Once I have found a suitable location to make the venipuncture with a 21-gauge butterfly needle, it's placed into the vein. I receive confirmation that it is in the vein by a small amount of blood in what's known as a flash chamber.

> Once I have that confirmation, I apply the vacuum tube to the back end of the needle and tubing assembly, allow them to fill as much as they can with

11

> the blood. I then invert them upright and upside down several times to mix the powder that's within the tube.
>
> Once that has been completed, I generally hold onto the tubes, remove the tourniquet, and then place a cotton ball or piece of gauze over the site of the venipuncture, remove the needle and tape the dressing down.
>
> Following that the tubes are generally sealed with a two-sticker seal and I then turn over custody of them to the arresting officer.

This is "the same type of procedure[] they use to draw blood in the emergency room." Indeed, Goethel agreed that "the emergency room technicians [are] trained at some of the same places [Goethel] is," at least "to [his] knowledge." The defense asked Goethel, "Other than the letter that has been introduced, are there other instructions or protocols from Dr. Mendoza that you follow?" Goethel's response was, "Regarding the blood draw, I would have to check. I believe there are."

¶24 Goethel was asked whether he "ever had anyone have any difficulties while [he] [was] drawing their blood in the blood draw room at the jail." Goethel replied "[y]es" and explained that "[A]fter my initial attempt on one occasion, I was preparing for a second venipuncture, [and] the subject, a male subject, lost consciousness and myself and one or two jail deputies assisted him to the floor. I immediately requested the jail staff page for an ambulance." The individual recovered and, as far as Goethel was aware, did so without any difficulties.

12

¶25 The State questioned Goethel about the specific blood draw that had occurred in this case. Goethel talked to Deputy Schlough prior to drawing Kozel's blood. Deputy Schlough explained that Kozel "had been read the Informing the Accused and that [Goethel] could proceed with the blood draw." Goethel typically received this confirmation before performing a blood draw. Kozel was cooperative, and Goethel's report did not "indicate anything out of the ordinary." Before drawing the blood, Goethel did not "speak with [Kozel] about any health issues that [Kozel] ha[d]" and did not ask Kozel "if he was on any medication." Goethel "didn't verify [Kozel's] medical status at all." Goethel drew the blood according to the procedures explained above. Goethel did not "have any problems with [Kozel's] blood draw." When asked if Kozel had any problems, Goethel replied, "Not that I recall." Goethel had not heard that the defendant had had "any issues concerning infection or anything."

¶26 After hearing all of this testimony, the circuit court orally denied Kozel's motion pertaining to the blood draw that occurred.

¶27 On January 9, 2015, Kozel pleaded no contest to one count of operating a motor vehicle while intoxicated, contrary to Wis. Stat. § 346.63(1)(a) (2013-14), second offense, see Wis. Stat. § 346.65(2)(am)2. (2013-14). The court sentenced Kozel to 17 days in the Sauk County jail with Huber privileges, assessed a fine and costs, ordered Kozel's driving privilege revoked for

13

15 months, and specified requirements for reinstatement of that privilege.

¶28 On March 30, 2015, Kozel filed a notice of appeal. On November 12, 2015, the court of appeals reversed the circuit court's judgment of conviction and remanded the case to the circuit court to suppress the evidence obtained from Kozel's blood. Kozel, unpublished slip op., ¶1. The court of appeals concluded that "the evidence was insufficient to establish that the EMT [who drew Kozel's blood] was operating under the direction of a physician." Id., ¶14. Given that conclusion, the court of appeals found it unnecessary to analyze whether the blood draw was constitutionally reasonable and thus did not do so. Id. (citing Gross v. Hoffman, 227 Wis. 296, 300, 277 N.W. 663 (1938)).

¶29 On December 11, 2015, the State filed a petition for review in this court. On March 7, 2016, this court granted the petition.

## III. STANDARD OF REVIEW

¶30 In cases involving review of decisions on motions to suppress evidence, this court "review[s] the circuit court's findings of historical fact under a deferential standard, upholding them unless they are clearly erroneous," then "independently appl[ies] constitutional principles to those facts." State v. Tullberg, 2014 WI 134, ¶27, 359 Wis. 2d 421, 857 N.W.2d 120 (quoting State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463).

14

¶31 This case also necessitates "interpretation and application" of a statute, matters "present[ing] questions of law that we review de novo while benefiting from the analyses of the court of appeals and circuit court." _Journal Times v. Racine Bd. of Police & Fire Comm'rs_, 2015 WI 56, ¶42, 362 Wis. 2d 577, 866 N.W.2d 563 (quoting _118th St. Kenosha, LLC v. DOT_, 2014 WI 125, ¶19, 359 Wis. 2d 30, 856 N.W.2d 486).

IV.  ANALYSIS

¶32 We need address only two issues in this case: (1) whether Goethel was a "person acting under the direction of a physician" when he drew Kozel's blood, Wis. Stat. § 343.305(5)(b); and (2) whether Kozel's blood was drawn in a constitutionally reasonable manner. We now analyze these questions.[4]

A. Whether Goethel Was a Person Acting Under the
Direction of a Physician When He Drew Kozel's Blood

¶33 Wisconsin Stat. § 343.305, "known as the implied consent law," _Village of Elm Grove v. Brefka_, 2013 WI 54, ¶19, 348 Wis. 2d 282, 832 N.W.2d 121, _amended by_ 2013 WI 86, 350

---

[4] The State argues that suppression is not required even if Goethel did not comply with Wis. Stat. § 343.305(5)(b), as long as the blood draw that occurred was constitutionally reasonable. We need not resolve that issue in light of our conclusions today. _See Walworth State Bank v. Abbey Springs Condo. Ass'n, Inc._, 2016 WI 30, ¶13 n.7, 368 Wis. 2d 72, 878 N.W.2d 170 ("Typically, an appellate court should decide cases on the narrowest possible grounds." (quoting _Maryland Arms Ltd. P'ship v. Connell_, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15)). This opinion should not be read to address the issue.

Wis. 2d 724, 838 N.W.2d 87, governs the testing of a motorist's "breath, blood or urine, for the purpose of determining the presence or quantity in his or her blood or breath, of alcohol, controlled substances, controlled substance analogs or other drugs, or any combination of alcohol, controlled substances, controlled substance analogs and other drugs." Wis. Stat. § 343.305(2). We examine a "single, narrow aspect of the procedures set forth in the implied consent law," Brefka, 348 Wis. 2d 282, ¶19, namely the set of individuals authorized to draw blood under the statute.

¶34 Section 343.305(5)(b) provides in relevant part:

> Blood may be withdrawn . . . to determine the presence or quantity of alcohol, a controlled substance, a controlled substance analog or any other drug, or any combination of alcohol, controlled substance, controlled substance analog and any other drug in the blood <u>only by a physician, registered nurse, medical technologist, physician assistant or person acting under the direction of a physician</u>.

Wis. Stat. § 343.305(5)(b) (emphasis added).[5] The State argues that this requirement is fulfilled because Goethel drew blood

---

[5] The legislature recently amended the language at issue in this case. See 2013 Wis. Act. 224, § 3. The statute now reads, in relevant part:

> Blood may be withdrawn . . . to determine the presence or quantity of alcohol, a controlled substance, a controlled substance analog, or any other drug, or any combination of alcohol, controlled substance, controlled substance analog, and any other drug in the blood <u>only by a physician, registered nurse, medical technologist, physician assistant, phlebotomist, or other medical professional who is</u>

(continued)

16

under the direction of Dr. Mendoza. Kozel contends that the evidence introduced by the State was insufficient to establish compliance with the statute. There appears to be no dispute, nor any reason to dispute, that Goethel is a "person" and that Dr. Mendoza is a "physician" within the meaning of § 343.305(5)(b). Thus, the only question is whether Goethel was "acting under the direction" of Dr. Mendoza when he drew Kozel's blood. We conclude that the evidence is sufficient to show that Goethel was a "person acting under the direction of a physician." Id.

¶35 "[W]e have repeatedly held that statutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.' Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citations omitted) (quoting Seider v. O'Connell, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659). The court of appeals below relied on a definition of "direction" taken from Webster's Third New International Dictionary: "guidance or supervision of action, conduct, or operation." Kozel, unpublished slip op.,

---

authorized to draw blood, or person acting under the direction of a physician.

Wis. Stat. § 343.305(5)(b) (2013-14) (emphasis added).

17

¶13 (quoting Direction, Webster's Third New International Dictionary 640 (1993)). This definition is adequate for our purposes.

¶36 The evidence below showed that Dr. Mendoza, the medical "director" of BDAS of at least seven years, specifically "authorized a standing order" for BDAS EMT intermediate technicians such as Kozel to perform blood draws when requested to do so by law enforcement. A "standing order" is "an instruction or prescribed procedure in force permanently or until specifically changed or canceled." Standing order, Webster's Third New International Dictionary 2224 (1993). Dr. Mendoza's authorization was formalized in a writing which also contained his confirmation that the EMTs had "completed extensive training regarding the procedures and legalities of obtaining blood draws." Finally, Goethel was able to contact Dr. Mendoza if necessary when performing a blood draw.

¶37 This evidence demonstrates that BDAS EMTs are acting under Dr. Mendoza's direction. The concept of "direction" reasonably contemplates varying degrees of proximity between a director and the person whose actions he or she guides rather than a single, set relationship applicable in all cases. Had the legislature envisioned only one manner of "direction," it would have spelled out the specific procedures that a physician and the person he or she directs must follow to meet that requirement. See State v. Penzkofer, 184 Wis. 2d 262, 266, 516 N.W.2d 774 (Ct. App. 1994) ("[T]he legislature could have chosen to require the test to be taken by or taken in the presence of a

18

physician, but it did not."); cf., e.g., Longview Fibre Co. v. Rasmussen, 980 F.2d 1307, 1314 (9th Cir. 1992) (dismissing petition for review) ("Had Congress intended a more general meaning, it would have used more general words.").

¶38 If Dr. Mendoza had trained the BDAS EMTs himself, ordered each blood draw on a case-by-case basis, and personally observed each individual blood draw, there would likely be no dispute that the EMTs were acting under Dr. Mendoza's direction. But blood draws are "routine" affairs, Schmerber v. California, 384 U.S. 757, 771 n.13 (1966) (quoting Breithaupt v. Abram, 352 U.S. 432, 436 (1957)), and nothing in Wis. Stat. § 343.305(5)(b) prevents a physician from supervising such standard procedures in a more streamlined fashion. Thus, instead of training the EMTs on his own, Dr. Mendoza satisfied himself that the EMTs had "completed extensive training regarding the procedures and legalities of obtaining blood draws" and made that fact known to others in his writing. Instead of ordering each blood draw on a case-by-case basis, Dr. Mendoza issued a standing order authorizing EMTs to draw blood when requested to do so by law enforcement. And instead of personally observing each individual blood draw, Dr. Mendoza allowed EMTs to perform blood draws on their own, but made himself accessible by telephone should any problems arise.

¶39 The testimony below leaves no doubt that it is Dr. Mendoza who is in charge of blood-drawing activities conducted by BDAS EMTs. To require more evidence than what the State provided below to establish that Goethel was acting under

19

the direction of Dr. Mendoza would be to require a specific type or degree of direction where the statute at issue does not so specify. "We will not read into the statute a limitation the plain language does not evidence." Cty. of Dane v. LIRC, 2009 WI 9, ¶33, 315 Wis. 2d 293, 759 N.W.2d 571. The court of appeals erred in concluding otherwise.

## B. Whether Kozel's Blood Was Drawn in a Constitutionally Reasonable Manner

¶40 The Fourth Amendment to the United States Constitution, applicable to the states though the Fourteenth Amendment, e.g., State v. Kramer, 2009 WI 14, ¶18, 315 Wis. 2d 414, 759 N.W.2d 598 (citing Mapp v. Ohio, 367 U.S. 643 (1961)), provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[6] "Virtually any 'intrusio[n] into the human body' will work an invasion of '"cherished personal security" that is subject to constitutional scrutiny.'" Maryland v. King, 569 U.S. ___, 133 S. Ct. 1958, 1969 (2013)

---

[6] "We have historically interpreted the Wisconsin Constitution's [Article I, § 11] protections in this area identically to the protections under the Fourth Amendment as defined by the United States Supreme Court." State v. Dearborn, 2010 WI 84, ¶14, 327 Wis. 2d 252, 786 N.W.2d 97 (citing State v. Kramer, 2009 WI 14, ¶18, 315 Wis. 2d 414, 759 N.W.2d 598). We will reference only the Fourth Amendment in this opinion.

20

(alteration in original) (citation omitted) (quoting Schmerber, 384 U.S. at 770; then quoting Cupp v. Murphy, 412 U.S. 291, 295 (1973)). Consistent with this principle, "the taking of a blood sample . . . is a search" under the Fourth Amendment. Birchfield v. North Dakota, 579 U.S. ___, 136 S. Ct. 2160, 2173 (2016).

¶41 Nevertheless, "[t]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner." King, 133 S. Ct. at 1969 (quoting Schmerber, 384 U.S. at 768).

¶42 In Schmerber the Supreme Court assessed the constitutional reasonableness of a blood draw of a drunk driver, characterizing the applicable issues as "whether the police were justified in requiring petitioner to submit to the blood test, and whether the means and procedures employed in taking his blood respected relevant Fourth Amendment standards of reasonableness." Schmerber, 384 U.S. at 758-59, 768. After concluding that a warrant was not required in that case, id. at 768-71, the Supreme Court briefly examined the State's "means of testing" the defendant's blood-alcohol content and "manner" in which "the test was performed." Id. at 771-72. With regard to the State's "means of testing," the Supreme Court explained:

> Extraction of blood samples for testing is a highly
> effective means of determining the degree to which a
> person is under the influence of alcohol. Such tests
> are a commonplace in these days of periodic physical
> examination and experience with them teaches that the
> quantity of blood extracted is minimal, and that for

21

most people the procedure involves virtually no risk, trauma, or pain.

Id. at 771 (citation omitted).   In a footnote, the court remarked:

> The blood test procedure has become routine in our everyday life.   It is a ritual for those going into the military service as well as those applying for marriage licenses.   Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors.

Id. at 771 n.13 (quoting Breithaupt, 352 U.S. at 436).   With regard to the "manner" in which "the test was performed," the Court concluded:

> [T]he record shows that the test was performed in a reasonable manner.   Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices.   We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment——for example, if it were administered by police in the privacy of the stationhouse.   To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.

Id. at 771-72.

¶43 Kozel argues that certain material differences between the blood draw that occurred in this case and the blood draw that occurred in Schmerber require suppression of evidence. Specifically, Kozel simply maintains that the State failed to establish that the manner in which the State drew his blood——by an EMT in a jail rather than "by a physician in a hospital

22

environment according to accepted medical practices," id. at 771——was constitutionally reasonable.  We reject this argument.[7]

¶44  First, it was not unreasonable for an EMT, as opposed to a physician, to draw Kozel's blood.  We need not resolve the parties' dispute over whether Goethel technically qualifies as a "medical professional" or a "paraprofessional."  The important point for constitutional purposes is that the evidence demonstrated that Goethel was thoroughly trained and experienced in properly drawing blood.  Additionally, if any medical issues arose for which Goethel was not equipped, Goethel had access to physicians who could assist.  The Schmerber Court explained with regard to blood testing that "for most people the procedure involves virtually no risk, trauma, or pain."  Id. at 771.  Its concern——though it did not decide the issue——was that procedures "made by other than medical personnel . . . might . . . invite an unjustified element of personal risk of infection and pain."  Id. at 772.  We fail to see how performance of such an everyday

---

[7] Kozel does not argue that other differences between the circumstances in Schmerber and those in this case require suppression, and we do not comment on them.  See generally Winston v. Lee, 470 U.S. 753, 760-63 (2013) (discussing the list of items considered by the Supreme Court in Schmerber v. California, 384 U.S. 757 (1966), as relevant to the constitutionality of the blood test that occurred in that case, including "the ordinary requirements of the Fourth Amendment," "the extent to which the procedure may threaten the safety or health of the individual," "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity," and "the community's interest in fairly and accurately determining guilt or innocence").

procedure by a licensed, certified EMT unjustifiably increases such a risk. The evidence presented showed the opposite. Nor do we conclude that the State's failure to introduce specific protocols for drawing blood mandates a different result, where Goethel testified as to his training in drawing blood, the specific procedures he was taught to follow, and the fact that he followed those procedures in this case. The circuit court's finding that Kozel's blood was drawn "in accordance with medically accepted procedures" is not clearly erroneous.

¶45 Second, it was not unreasonable for the blood draw to occur in the non-medical setting of the jail. As the trial court explained, the evidence indicated that the room in which Kozel's blood was drawn "was clean and as clean as a hospital emergency room." Further, Goethel used a new blood draw kit containing a sterile needle. While some non-medical settings——indeed, some jails——might "invite an unjustified element of personal risk of infection and pain," Schmerber, 384 U.S. at 772, the evidence presented by the State dispelled any such fears as to the particular room in the particular jail at issue. See State v. Daggett, 2002 WI App 32, ¶14, 250 Wis. 2d 112, 640 N.W.2d 546 ("[W]e reject Daggett's assertion that blood draws must take place in a hospital setting in order to be constitutionally reasonable. Although Schmerber urged caution, it did not categorically reject the possibility that a blood draw could take place in a non-medical setting." (citation omitted)).

24

¶46 Finally, we would be remiss if we failed to mention the lack of evidence that Kozel ever objected to the particular circumstances of the blood draw.  See Schmerber, 384 U.S. at 771 ("Petitioner is not one of the few who on grounds of fear, concern for health, or religious scruple might prefer some other means of testing . . . ."); cf. Tullberg, 359 Wis. 2d 421, ¶31 ("A warrantless, nonconsensual blood draw of a suspected drunken driver complies with the Fourth Amendment if: . . . (4) the suspect did not reasonably object to the blood draw.").

¶47  In sum, the blood draw that occurred in this case was constitutionally reasonable.  See, e.g., State v. Johnston, 336 S.W.3d 649, 651-53, 655, 664 (Tex. Crim. App. 2011) (blood draw in "blood-draw room" at police station by police officer certified as an intermediate EMT assisted by police officer certified as a basic EMT held constitutionally reasonable), cert. denied, 132 S. Ct. 212 (2011).

V.  CONCLUSION

¶48  We conclude that the EMT who drew Kozel's blood was a "person acting under the direction of a physician," Wis. Stat. § 343.305(5)(b),  and that Kozel's blood was drawn in a constitutionally reasonable manner.  Accordingly, we reverse the decision of the court of appeals.

*By the Court.*-The decision of the court of appeals is reversed.

¶49 ANN WALSH BRADLEY, J. *(dissenting).* As the State has acknowledged, this case in essence presents a question of sufficiency of evidence.

¶50 Because we are a law developing court setting precedent for the entire state, we generally do not accept for review sufficiency of evidence cases because they often are tied to the unique facts of a particular case and thus have very limited precedential value.

¶51 Likewise, we generally eschew cases of statutory interpretation where the statute has subsequently changed because of the limited application of the decision. Nevertheless, in this case the majority tackles both circumstances and reverses the unpublished decision of the court of appeals.

¶52 The petitioner, State of Wisconsin, asserts that the court of appeals erred when it determined that the State failed to present sufficient evidence to show that the EMT was a "person acting under the direction of a physician" as required by statute.[1] It further contends that under the facts presented it has demonstrated that the blood draw was constitutionally reasonable under the Fourth Amendment of the United States Constitution.

¶53 The majority agrees with the State. Majority op., ¶¶34, 48. However, it missteps in its analysis when construing

---

[1] Wis. Stat. § 343.305(5)(b) (2011-12). All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

1

the former statute by conflating the terms "direction" and "authorization," thereby sub silentio writing into the statute a word not used or intended by the legislature.

¶54 In determining that Kozel's blood draw satisfied statutory requirements and was constitutionally reasonable, the majority also errs when it excuses the failure of the State to present evidence sufficient to demonstrate that the EMT in this case was acting under the direction of a physician.

¶55 Contrary to the majority, I conclude that there is insufficient evidence to determine that the EMT-Intermediate technician who drew Kozel's blood was a "person acting under the direction of a physician" as required by Wis. Stat. § 343.305(5)(b). Likewise, I determine that Kozel's blood draw was not constitutionally reasonable based upon the facts of record.

¶56 I would affirm the court of appeals and remand to the circuit court for further proceedings. Accordingly, I respectfully dissent.

I

¶57 Wisconsin's implied consent statute authorizes legal blood draws in order to obtain evidence of intoxication. Section § 343.305(5)(b) provides in relevant part that "[b]lood may be withdrawn . . . to determine the presence or quantity of alcohol . . . only by a physician, registered nurse, medical technologist, physician assistant or person acting under the direction of a physician." In this case, Kozel's blood was

2

drawn by an EMT-Intermediate Technician ("the EMT") in a pre-booking room in the Sauk County Jail.

¶58 The State asserts that there was sufficient evidence to support the requirement that the EMT was a "person acting under the direction of a physician" pursuant to Wis. Stat. § 343.305(5)(b). The majority embraces the State's position.

¶59 In interpreting the statute, the majority relies on a plain meaning analysis of the term "direction." Majority op., ¶35. Initially it follows the court of appeals approach, adopting the dictionary definition which requires "guidance or supervision of action, conduct or operation." Id. However, it rejects the court of appeals conclusion that there is insufficient evidence in this record to show that the EMT was a "person acting under the direction of a physician." Majority op., ¶¶35-39 (citing Webster's Third New International Dictionary 640 (1993)).

¶60 The majority reasons that "[t]he concept of 'direction' reasonably contemplates varying degrees of proximity between a director and the person whose actions he or she guides rather than a single, set relationship applicable in all cases." Majority op., ¶37. I agree.

¶61 However, it proceeds next to set up a strawman only to subsequently knock it down when it concludes that "[h]ad the legislature envisioned only one manner of 'direction,' it would have spelled out the specific procedures that a physician and the person he or she directs must follow to meet that requirement." Id. According to the majority, "[w]e will not

3

read into the statute a limitation the plain language does not evidence." Majority op., ¶39 (quoting Cty. of Dane v. LIRC, 2009 WI 9, ¶33, 315 Wis. 2d 293, 759 N.W.2d 571).

¶62 No one even attempts to advance an argument that the statute should be read in such a limited fashion. Not the defendant, not the court of appeals and certainly not this dissent.

¶63 Rather, what needs to be done, and what the majority skirts by setting up the fabricated argument, is an examination of whether the evidence presented here demonstrates that the EMT was acting under the physician's direction, that is, under the "guidance or supervision of action, conduct or operation."

¶64 Although this court often resorts to using dictionary definitions when engaging in statutory construction, we also often find guidance by looking at how other courts have defined the same statutory language. In People v. Gregg, the Illinois court of appeals interpreted the statutory phrase "acting under the direction of a physician" in a similar context to this case.[2] 526 N.E.2d 537, 539 (Ill. App. Ct. 1988).

¶65 The Illinois court of appeals defined "acting under the direction" of a physician to mean that:

---

[2] 77 Ill. Adm. Code 510.110(a)(2) (1985) provides in relevant part:

> The blood sample shall be collected per venipuncture by a physician licensed to practice medicine by a registered nurse or by a trained phlebotomist acting under the direction of a licensed physician (emphasis added).

4

> [W]ork is performed under the guidance and direction of a supervisor who is responsible for the work, who plans work and methods, who is available on short notice to answer questions and deal with problems that are not strictly routine, who regularly reviews the work performed, and who is accountable for the results.

Id. (citing 77 Ill. Am. Code 300.330, 330.330, 350.330, 370.240, 390.330 (1985)).

¶66 The physician in Gregg was not present when a trained phlebotomist performed a blood draw, but was "responsible for supervising emergency room procedures." Id. at 538. Thus, Gregg concluded that "[i]n light of the complex and extensive procedures already required in performing a blood analysis," a trained phlebotomist acting under a physician's supervision sufficiently ensured the accuracy and uniformity of blood analysis. Id. at 539.

¶67 Armed with the dictionary definition of "direction" and further informed by Gregg's interpretation of the statutory phrase, I normally would turn next to an examination of whether the evidence here is sufficient to meet the statutory directive.

¶68 Yet, I would be remiss to ignore an additional impediment in the majority's statutory analysis. It missteps when it conflates the statutory term "direction" with a distinctly different term "authorization."

¶69 As set forth more fully above, "direction" requires guidance and supervision. The plain meaning of "authorize" is defined as "to give permission for (something); sanction."[3]

---

[3] The majority does not include the definition of "authorize" in its opinion.

5

American Heritage Dictionary of the English Language 120 (5th ed. 2011). Despite this distinction between "direction" and "authorization," in determining that the EMT was acting under the direction of a physician, the majority relies almost entirely on the fact that he was <u>authorized</u> by Dr. Mendoza to draw blood. <u>See e.g.</u>, majority op., ¶36 ("The evidence below showed that Dr. Mendoza, the medical 'director' of BDAS of at least seven years, specifically '<u>authorized</u> a standing order' for BDAS EMT intermediate technicians such as Kozel to perform blood draws when requested to do so by law enforcement. . . . Dr. Mendoza's <u>authorization</u> was formalized in writing . . . .") (emphasis added); <u>see also</u> majority op., ¶¶2, 15, 38.[4]

¶70 The majority relies upon an August 21, 2009 letter written by Dr. Mendoza, the Medical Director for the Baraboo District Ambulance Service, which authorized the EMT to perform the blood draws at the request of law enforcement. Specifically, Dr. Mendoza's letter "authorized a standing order for the EMT-Paramedics and approved EMT-Intermediate Technicians authority to draw legal blood draws at the request of law

---

[4] Majority op., ¶2 ("The EMT was authorized in writing by a physician to draw blood when asked to do so by law enforcement."); majority op., ¶15 ("The State introduced into evidence . . . '[A] letter from Dr. Mendoza to our staff, our administration stating that the authorized EMT paramedics and intermediate technicians may perform legal blood draws.'"); majority op., ¶38 (" . . . Dr. Mendoza issued a standing order authorizing EMTs to draw blood when requested to do so by law enforcement.").

enforcement officers." It further states that "[t]he Baraboo District Ambulance Services EMT-Paramedics and EMT-Intermediate Technicians are acting under the direction of my physician license."

¶71 As the court of appeals in this case explained, evidence that an EMT was authorized to act under a physician's license is not evidence that the EMT was acting under the physician's direction. State v. Kozel, No. 2015AP656-CR, unpublished slip op., ¶13 (Wis. Ct. App. Nov. 12, 2015). Dr. Mendoza's letter authorizes EMTs to conduct blood draws because it grants them the authority to do so at the request of law enforcement. However, it tells us nothing about the physician's guidance or supervision of the EMT's actions when conducting a blood draw.

¶72 The distinction between "directed" and "authorized" is further supported by recent changes to the statutory provision at issue here. Pursuant to 2013 WI Act 224, the legislature amended section 343.305(5)(b) to include medical professionals who are authorized to draw blood as a distinct category from a "person acting under the direction of a physician." Under the amended statute, a blood draw may now be performed by authorized medical professionals:

> Blood may be withdrawn . . . to determine the presence or quantity of alcohol . . . only by a physician, registered nurse, medical technologist, physician assistant, phlebotomist, or other medical professional who is authorized to draw blood, or person acting under the direction of a physician.

Wis. Stat. § 343.305(5)(b) (2013-14) (emphasis added).

7

¶73 According to the Wisconsin Legislative Council Act Memorandum for 2013 Wis. Act 224, the 2011-2012 version of the statute at issue in this case provided that only individuals "acting under the direction of a physician could draw blood." Conversely, the amended statute now allows a phlebotomist or other medical professional who is authorized to draw blood, in addition to the other health care providers listed under prior law:

> Under prior law, only a physician, registered nurse, medical technologist, physician assistant, or personal acting under the direction of a physician could draw blood for alcohol or controlled substance testing.
>
> Act 224 allows a phlebotomist or other medical professional who is authorized to draw blood, in addition to the other health care providers listed under prior law, to draw blood for alcohol or controlled substance testing.

Wisconsin Legislative Council Act Memorandum for 2013 Wis. Act 224 (April 14, 2014), available at http://docs.legis.wisconsin.gov/2013/related/lcactmemo/act224.

¶74 This statutory change suggests that the EMT in this case, who was formerly not permitted to draw blood under the statute unless "acting under the direction of a physician," now may be permitted to draw blood under the statute if he qualifies as an other medical professional who is authorized to draw blood.

¶75 Unlike the newly amended statute, the 2011-12 version of the statute that is the subject of our analysis here uses the term "direction" but not the term "authorize." In conflating the two terms in its analysis, the majority is sub silencio

8

writing into the prior statute terms not then used or intended by the legislature.

                                  II

¶76 Perhaps because the majority conflates "direction" with "authorization," it incorrectly concludes that there was sufficient evidence that the EMT was acting under the direction of a physician as required by Wis. Stat. § 343.305(5)(b). This misstep allows the majority to disregard the lack of evidence presented in this case in contrast to evidence deemed sufficient in other similar cases.

¶77 In State v. Penzkofer, 184 Wis. 2d 262, 265, 516 N.W.2d 774 (Ct. App. 1994), a certified laboratory technician performed a blood draw in a hospital, but without a physician present in the room at the time of the blood draw. However, the hospital pathologist testified that the technician performed laboratory functions under his general supervision and direction. Id.

¶78 Significantly, the physician identified a written hospital protocol setting forth the detailed procedures that guided a technician performing a blood draw. Id. These procedures were reviewed and revised, and the protocol was dated and signed by the physician. Id. The physician testified that he did not "stand over [the technician's] shoulder" because "[t]hen I might as well draw it myself . . . or I'm busy with other work . . . so I couldn't be two places at one time." Id.

¶79 Considering the evidence of written procedures and protocols that were reviewed in a hospital setting by a physician, the Penzkofer court concluded that "the procedure

9

used here meets the legislature's concern for testing in such a manner as to yield reliable and accurate results. Id. at 266. It explained that "[h]ospital laboratories are subject to detailed and stringent standards in almost every aspect of their facilities and services." Id. (citing Wis. Admin. Code § HSS 124.17). Penzkofer reasoned further that "[t]he certified lab assistant followed a written protocol approved and kept current by the pathologist." Id. (emphasis added).

¶80 The court of appeals concluded that "Penzkofer's concern for safety and accuracy are addressed by those standards as well as the procedures in place here." Id. Conversely, the majority opinion neglects to consider how the lack of protocols setting forth detailed procedures for performing a blood draw, as well as the lack of detailed sanitation standards governing blood draws at the jail, might undermine confidence in the safety and accuracy of Kozel's blood drawn.

¶81 Additionally, unlike here, in another unpublished case involving a blood draw performed by an EMT at the Sauk County jail, the State presented evidence of written protocols and procedures that guided the technician. In State v. Heath, No. 2014AP2466-CR, unpublished slip op., ¶5 (Wis. Ct. App. Sept. 15, 2016), the State introduced a letter from the paramedic program coordinator for the Department of Health Services ("DHS") that "approved the Baraboo District Ambulance Service's revised and updated protocol for legal blood draws, and which authorized the ambulance service to implement the protocol."

¶82 Even in cases where written protocols setting forth detailed procedures were not introduced, the State presented significantly more evidence of direction by a physician than was introduced here. As explained above, "direction" requires "guidance or supervision of action." See also Gregg, 526 N.E.2d at 539 (concluding that there was sufficient evidence of direction when a supervising physician planed work and methods, was available on short notice, regularly reviewed the work performed, and was accountable for the results).

¶83 For example, in State v. Osborne, No. 2012AP2540-CR, unpublished slip op., ¶19 (Wis. Ct. App. June 27, 2013), the EMT testified that he was "operating under the supervision of a physician, that a physician 'signed off' on the performance of the EMT's duties, that the EMT was in at least monthly contact with that physician, and that the EMT could be in contact with that physician at any time if the need arose." Accordingly, the blood draw was performed under the direction of a physician because he regularly reviewed the work performed and was accountable for the results.

¶84 Contrary to Penzkofer and other unpublished cases such as Heath and Osbourne, the facts in the record here demonstrate an absence of direction by a physician, including an absence of written protocols setting forth the detailed procedures that the EMT must follow when performing a blood draw. Here, the only evidence introduced was the testimony of the EMT and Dr. Mendoza's letter. When asked about whether there were written protocols setting forth procedures for performing a blood draw,

the EMT equivocated and could not identify any.  He responded "[r]egarding the blood draw, I would have to check."

¶85 In other cases, even where detailed procedures were not introduced, there was testimony that the EMT had regular contact with the supervising physician who took responsibility for the EMT's work.  See, e.g., Osborne, No. 2012AP2540-CR, unpublished slip op., ¶19.  The EMT in Osbourne testified that he was in at least monthly contact with the supervising physician.  Id.  Unlike Osbourne where the EMT testified that the supervising physician signed off on the performance of his duties, the EMT in this case testified that he had never spoken to Dr. Mendoza about the letter authorizing him to conduct blood draws.  Rather, the EMT testified only that Dr. Mendoza "occasionally show[ed] up" at his place of work.  Absent from the record is any indication that when Dr. Mendoza occasionally appeared that the EMT had any contact whatsoever with the physician——let alone any supervision or guidance from him.

¶86 Contrary to the majority's assertion, the facts in the record demonstrate a total absence of guidance and supervision necessary to support a determination that the EMT here was acting under the direction of a physician:

- The State did not introduce into evidence any protocols or procedures guiding blood draws by an EMT.
- There are no protocols to ensure that the jail's blood draw room is sterile or meets the appropriate standard.
- Dr. Mendoza did not train the EMT.

12

- Dr. Mendoza had never been to the jail nor inspected the room where blood is drawn at the jail.

- Dr. Mendoza never witnessed the EMT perform any blood draws.

- There is no evidence that Dr. Mendoza approved or supervised the EMT's blood draw techniques on a regular or even irregular basis.

- There is no evidence that the EMT had regular or even irregular contact with Dr. Mendoza.

¶87 In short, no evidence was presented of any supervision of this EMT by Dr. Mendoza, whether it be general or direct. Additionally, there is a dearth of evidence demonstrating any guidance by Dr. Mendoza. Thus, contrary to the majority, I conclude that there is insufficient evidence to determine that the EMT-Intermediate who drew Kozel's blood was a "person acting under the direction of a physician." Wis. Stat. § 343.305(5)(b).

III

¶88 Given the state of the evidentiary record, I turn next to examine whether the blood draw here was constitutionally reasonable under the Fourth Amendment of the United States Constitution, which provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated . . . ."

¶89 In the context of a blood draw, the United States Supreme Court has explained that "[t]he integrity of an

13

individual's person is a cherished value of our society." Schmerber v. California, 384 U.S. 757, 772 (1966). Accordingly, the "overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusion by the State." Id. at 767.

¶90 The Fourth Amendment does not prohibit all intrusions, however, but only those which are not justified under the circumstances or are made in an improper manner. Id. at 768. Thus, the question in Schmerber, as in this case, was whether "the means and procedures employed in taking [] blood respected relevant Fourth Amendment standards of reasonableness." Id.

¶91 Relying on Schmerber, the majority contends that "[t]he blood test procedure has become routine in our everyday life" and "that for most people the procedure involves virtually no risk, trauma or pain." Majority op., ¶42 (citing 384 U.S. at 771). The majority does not acknowledge, however, that the United States Supreme Court has recently emphasized the serious nature of a blood test.

¶92 In Birchfield v. North Dakota, 136 S. Ct. 2160, 2178 (2016), the Supreme Court explained that "[b]lood tests are a different matter [from breath tests]. They 'require piercing the skin' and extract a part of the subject's body." (citations omitted). As Birchfield reasoned, although many people submit to blood draws, "the process is not one they relish." Id. Additionally, the Birchfield court noted that blood samples "can be preserved and from which it is possible to extract information beyond a simple BAC reading." Id.

14

¶93 Ignoring the serious and intrusive nature of a blood draw, the majority asserts that "[t]he important point for constitutional purposes is that the evidence demonstrated that [the EMT] was thoroughly trained and experienced in properly drawing blood." Majority op., ¶44. Schmerber was explicit, however, that "we reach this judgment only on the facts of the present record." 384 U.S. at 772. Thus, it warned that in other circumstances, such as a blood draw administered at a jail, may not be constitutionally reasonable:

> Petitioner's blood was taken by a physician in a hospital environment according to accepted medical practices. We are thus not presented with the serious questions which would arise if a search . . . were made by other than medical personnel or in other than a medical environment——for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might invite an unjustified element of personal risk of infection and pain.

Id. at 771-72.

¶94 In State v. Daggett, 2002 WI App 32, ¶¶8-15, 250 Wis. 2d 112, 640 N.W.2d 546, the Wisconsin court of appeals addressed whether under Schmerber, a warrantless blood draw performed by a doctor in a police booking room was reasonable under the Fourth Amendment. The majority parses Daggett, citing it only once for the proposition that a constitutionally reasonable blood draw can take place in a non-medical setting. Majority op., ¶45. It does not, however, analyze where this case falls on the spectrum of reasonableness set forth in Daggett.

15

¶95 Daggett moved to suppress the results of the blood test on the grounds that the blood draw was unlawful because it took place in the county jail booking room, rather than in a hospital.  Daggett, 250 Wis. 2d 112, ¶5.  The Daggett court concluded that "the method used to take the blood sample was a reasonable one and was performed in a reasonable manner."  Id., ¶14.

¶96 According to the Daggett court, "[r]ather than establishing a bright-line rule, Schmerber recognized a spectrum of reasonableness."  Id., ¶15.  It explained that a blood draw by a medical professional in a medical setting is generally reasonable, but blood withdrawn by a non-medical professional in a non-medical setting would raise "serious questions" of reasonableness.  Id. (citation omitted).  Thus, under Daggett, a blood draw "in a jail setting may be unreasonable if it 'invites an unjustified element of personal risk of infection and pain.'"  Id., ¶16 (citing Schmerber, 384 U.S. at 772).

¶97 Under Daggett's spectrum of reasonableness, the blood draw here falls below the standard of anything that has previously been determined to be reasonable.  In Schmerber, the blood draw was performed by a physician in a hospital.  384 U.S. at 758.  The blood draw in Daggett took place in a jail, but was performed by a physician.  250 Wis. 2d 112, ¶4.  In this case, Kozel's blood draw was performed by an EMT-Intermediate in a jail.

¶98 As such, this case represents the latter end of the Daggett spectrum of reasonableness.  Although a blood draw by an

16

EMT in a jail may not be per se unreasonable, it is unreasonable under the facts of this case.  As set forth above, there is no evidence of any written protocols or procedures in the record.  Dr. Mendoza did not train the EMT, had never witnessed him perform a blood draw, nor had he ever approved of his blood draw techniques.

¶99 Additionally, there are no protocols to ensure that the jail's blood draw room is sterile.  Admittedly, the EMT testified that the pre-booking room looked clean.  However, the pre-booking room where the blood draw was administered was also used to perform breathalyzer tests on those arrested for drunk driving and for miscellaneous storage.  According to the evidence, Dr. Mendoza had never been to the jail let alone inspected the pre-booking room where blood is drawn.

¶100 Other than testimony regarding the fact that jail staff have a schedule for cleaning, which is initialed by the cleaner and posted on the wall, there is no other evidence that the pre-booking room in the jail meets the high sanitary standards of a hospital.  To the contrary, such an initialed and posted cleaning schedule is akin to those found in many department or convenience store restrooms.

¶101 For example, the Wisconsin Administrative Code requires that hospitals maintain a sanitary environment, that sterilizing services be available at all times, and that a committee be established at each hospital to implement measures to make sure infections do not spread.  Wis. Admin. Code DHS § 124.08(2), (4)(b) and (e).  The rules for jails are less

17

stringent, requiring only monthly sanitation inspections. Wis. Admin. Code DOC § 350.12(13).

¶102 It is a well-established principle that "[i]t is the duty of courts to be watchful for the constitutional rights of the citizen, and against stealthy encroachments thereon." Schneckloth v. Bustamonte, 412 U.S. 218, 229 (1973) (citation omitted). Permitting blood draws in a jail without written protocols and procedures could erode Fourth Amendment protections beyond what was contemplated in Schmerber and Daggett.

¶103 Given the absence of written protocols and procedures, the record here lacks the same evidence of safety and accuracy present in cases in which a blood draw has been determined to be constitutionally reasonable. Thus, I determine that the evidentiary record is insufficient to conclude that the blood draw administered here was performed in a constitutionally reasonable manner.

¶104 For the reasons set forth above, I respectfully dissent.

¶105 I am authorized to state that Justice SHIRLEY S. ABRAHAMSON joins this dissent.